(No. 76406.— ■■■■■

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DARRIN W. SHATNER, Appellant.

*Opinion filed September 19, 1996.—Rehearing denied December 2, 1996.*

Charles M. Schiedel, Deputy Defender, and Kim Robert Fawcett, Assistant Defender, of the Office of the State Appellate Defender, of Chicago, for appellant.

James E. Ryan, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Arleen C. Anderson, Assistant Attorney General, of Chicago, and Renee Goldfarb and Timothy Felgenhauer, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HEIPLE delivered the opinion of the court:

Following a trial in the circuit court of Cook County, a jury found the defendant, Darrin Shatner, guilty of first degree murder, armed robbery, and arson. The defendant waived the jury for his sentencing hearing. The trial court found defendant eligible for the death penalty

based on the aggravating factor that he killed the victim in the course of another felony. 720 ILCS 5/9—1(b)(6) (West 1994). Finding that there were no mitigating factors sufficient to preclude the imposition of the death penalty, the court sentenced defendant to death. The defendant's sentence has been stayed (134 Ill. 2d R. 609(a)) pending direct appeal to this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d R. 603.

On appeal to this court, defendant argues that: (1) his counsel was ineffective for failing to present a sufficient defense to the charge of felony murder; (2) his counsel was ineffective for failing to challenge his eligibility for the death penalty during the eligibility phase of the sentencing hearing; (3) the trial court erroneously limited the cross-examination of a state witness; (4) his waiver of a sentencing jury was not knowing and intelligent; (5) he was denied a fair sentencing hearing by the introduction of gang affiliation evidence; (6) he was denied a fair sentencing hearing by the introduction of religious practices evidence; (7) his counsel was ineffective for failing to object to the State's introduction of evidence concerning defendant's gang affiliation and religious practices; (8) the trial court erred by considering his history of drug abuse solely in aggravation; (9) the sentence of death is excessive and inappropriate given the circumstances of the case; and (10) the Illinois death penalty statute is unconstitutional. For the following reasons, we affirm defendant's convictions and sentence.

## BACKGROUND

Evidence at trial revealed the following. In the afternoon of September 1, 1986, defendant went to the home of a neighborhood drug dealer, Joaquin, to purchase some cocaine. When he arrived, he met the victim, Daniel Schneider, and the victim's friend and former coworker, Jean Rogoz. The victim invited

everyone to his condominium to eat and to watch a movie. Defendant and Rogoz accepted his invitation.

The three arrived at the victim's residence. As the victim began to prepare chicken for dinner, defendant and Rogoz left to purchase some beer at a liquor store. Rogoz testified that on the way back to the victim's condominium, defendant asked her whether the victim had any valuables or money. After returning to the victim's residence, Rogoz overheard the defendant question the victim about whether he had anything they could sell in order to purchase some cocaine. The victim responded that he did not want to sell any of his belongings.

Rogoz further testified that, after she had taken some chicken and a glass of milk from the kitchen and sat down in the living room, she heard the victim cry out, "Jeannie, help me." Upon turning around she saw that the defendant had grabbed the victim from behind and was holding a six-inch pocket knife to his throat. Defendant began dragging the victim down the hallway towards the bedroom and ordered Rogoz into the bedroom. In the bedroom, defendant began to punch the victim with his fists until the victim was dazed. Defendant then left the room. According to Rogoz, defendant returned with a wooden lamp, a phone cord, and some cloth. Defendant bound the victim's legs with the cord and his hands with the cloth. After next striking the victim in the head with the wooden lamp, defendant began searching through the victim's dresser drawers. When the victim sat up in bed and looked at Rogoz, defendant struck him again with the lamp until he fell off the bed.

Rogoz stated that defendant next cut up the mattress and threw the stuffing around the room. The defendant then lit the bed and stuffing on fire. He grabbed Rogoz and told her that she was going with him. Before they left the apartment, defendant took the victim's VCR.

Thereafter, the defendant and Rogoz returned to Joaquin's by bus. Rogoz claimed that she told Joaquin what had happened, but he told her that there was nothing he could do. Defendant and Joaquin exchanged the VCR for cocaine. After using the cocaine, defendant and Rogoz took another bus ride to the apartment of a friend of the defendant, where they stayed the night.

The following day, defendant noticed a story in the newspaper regarding the victim's death. Rogoz testified that she asked him why he burned the victim, and the defendant replied, "To free his spirit." Defendant told Rogoz that he needed money to get away and Rogoz suggested that they set up a time to meet her brother, from whom she could get some money.

At approximately 7 p.m., Rogoz and the defendant met her brother in a parking lot. Rogoz testified that she was able to get away from the defendant at that time and that her brother took her to a friend's house where she called the police. Although she could not reach a detective that evening, she went to the police the next day.

Detective Ernest Halvorsen, with the Chicago police department, testified that he was assigned to investigate the murder of Daniel Schneider. After questioning Rogoz and the defendant's parents, Detective Halvorsen obtained a warrant for the defendant's arrest. However, he was unable to locate the defendant. Three years later, in December of 1989, the FBI contacted Detective Halvorsen and offered its assistance in the investigation. Eventually, in October of 1990, the FBI located the defendant in Portland, Oregon, where he was arrested.

Special Agent James D. Russell, with the FBI, testified about the circumstances of the defendant's arrest. After he was placed under arrest and transported to the Portland FBI office, defendant gave an oral statement to Russell. In this statement, he admitted that he met Ro-

goz and the victim at Joaquin's apartment. However, defendant claimed that it was Rogoz's idea to rob the victim and that she repeatedly pressured him to commit the crime. Although defendant initially resisted her entreaties, he accompanied Rogoz to the victim's apartment and assisted her in carrying out the robbery scheme because he was physically attracted to her. Defendant admitted initiating the robbery by grabbing the victim around the throat from behind in the kitchen and dragging him towards the back bedroom. However, defendant stated that as he was dragging the victim towards the bedroom, Rogoz struck the victim in the head with a vase or jar and a lamp, despite defendant's requests that she stop doing so. After defendant placed the victim on his bed, he checked his pulse to ascertain that the victim was still alive. Defendant stated that he then took off his bloody shirt and put on a shirt belonging to the victim. Defendant claimed that while he retrieved the VCR from the living room, Rogoz cut up the victim's bed and set it on fire. After they left the victim's apartment, defendant and Rogoz returned to Joaquin's apartment. They traded the VCR for cocaine.

Based on the information defendant provided, Russell prepared a written statement, which he read aloud to the defendant. Defendant made a few changes to the statement and signed it. Shortly thereafter, defendant was extradited to Illinois.

Defendant's trial commenced on May 13, 1993. In addition to the testimony previously outlined, the State also presented the testimony of Dr. Yuksel Konacki, who performed the autopsy on the body of the victim. His examination revealed that the victim's hyoid bone, the bone surrounding the larynx in the front of the neck, was fractured. Based on his findings, Dr. Konacki opined that the primary cause of the victim's death was strangulation while the secondary cause was blunt trauma to the head.

Benjamin Lieu, defendant's former cellmate at the Cook County jail, also testified. He stated that, while they were incarcerated together, defendant told him that women were unreliable and that the woman who was with him when he committed a murder panicked and did not help him at all. Defendant also told Lieu that he hit the murder victim with a lamp, and that he had to hit him many times because he had a very strong spirit.

Defendant testified on his own behalf at trial. His testimony was consistent with his statement to the FBI. He claimed that Rogoz instigated the events leading to the victim's death. Although defendant conceded that he grabbed the victim from behind, he claimed that it was Rogoz, not he, who struck the victim repeatedly and set him on fire. Defendant further stated that following the events at the victim's apartment, Rogoz voluntarily accompanied defendant to Joaquin's, where they ingested more cocaine. Defendant and Rogoz then spent the next few days together.

Mike Marshall, a former employee of the defendant's father, also testified for the defense. He claimed that he witnessed the defendant and Rogoz engaging in sexual relations at his father's office the day after the murder occurred, and that defendant did not appear to be restraining Rogoz.

Following deliberations, the jury returned a general verdict of guilty to the charges of first degree murder, armed robbery, and arson. Since defendant had waived his right to be sentenced by the jury prior to trial, sentencing took place before the same judge who presided over his trial.

After the first stage of the sentencing hearing, the judge found defendant eligible for the death penalty based on the aggravating factor that he killed another during the course of a felony. At the second stage of the

sentencing hearing, the State presented evidence of defendant's prior criminal history, including his arrests for theft, criminal damage to property, battery and resisting arrest. The State also presented testimony indicating that defendant practiced rituals in his jail cell in which he would chant and toss a feather about while naked and that he read books about satanic worship. The evidence also revealed that defendant fought in jail and that he was charged for possessing a shank in his cell.

In mitigation, defendant presented evidence indicating that he had felt unloved as a child, had begun using drugs when he was 13, and that, prior to his arrest, had been employed as a carpenter and was in a long-term relationship with his current girlfriend, with whom he had had a child. In allocution, defendant stated that he knew he was part of the murder, but that he did not intend to kill the victim. Defendant also stated that he was not a devil worshipper.

Following the sentencing hearing, the trial court found no mitigating factors sufficient to preclude the imposition of the death penalty and sentenced defendant to death.

## ANALYSIS

### I. Ineffective Assistance of Counsel

Defendant first contends that he received ineffective assistance of counsel at trial because his attorney failed to provide him any meaningful defense at all. Defendant impugns, among other things, his counsel's closing argument, wherein he stated:

> "I submit to you that [defendant's] statement about what happened is the correct version of what happened, and then if he's guilty of anything, he's guilty of robbery. What a tragedy to find this man guilty of murder that was committed by [Rogoz], and she walks out Scot-free."

As this language indicates, defense counsel suggested

that if defendant was guilty of anything, it was robbery, and not murder, because defendant never killed the victim, nor had he intended to do so. While acknowledging that this defense theory was appropriate to rebut the counts of intentional murder and knowing murder, defendant argues that his counsel was ineffective because, by conceding that defendant participated in a robbery during which the victim was killed, his counsel admitted felony murder.

A defendant alleging a violation of this sixth amendment right to effective assistance of counsel must generally meet the two-pronged test established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), and recognized by this court in *People v. Albanese*, 104 Ill. 2d 504 (1984). Under *Strickland*, the defendant (1) must show that his counsel's performance fell below the objective standard of reasonableness and (2) must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. A court need not determine whether counsel's performance was deficient before examining the prejudice suffered if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice. *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069; *Albanese*, 104 Ill. 2d at 527.

As an initial matter, defendant contends that because his counsel wholly failed to subject the State's case to meaningful adversarial testing, ineffective assistance of counsel can be presumed without application of the *Strickland* test. See *United States v. Cronic*, 466 U.S. 648, 80 L. Ed. 2d 657, 104 S. Ct. 2039 (1984). In so arguing, defendant places principal reliance on *People v. Hattery*, 109 Ill. 2d 449 (1985).

The *Hattery* defense counsel, during opening argument, proclaimed:

"Ladies and gentlemen of the jury, he [defendant] did it. He did everything [the prosecution] just told you. \*\*\*

We are not asking you to find [the defendant] not guilty. At the end of your deliberations, you will find him guilty of murder. We are asking you to consider the evidence that you hear today and in the next few days to explain why he did the horrible thing that he did. Once you have found him guilty, we will proceed and you will find him eligible for the death penalty. The question, and the only question facing you, will be whether to impose the death penalty on Charles Hattery for trying to save the life of his family. Thank you." *Hattery*, 109 Ill. 2d at 458-59.

During the guilt-innocence phase of trial, defense counsel advanced no theory of defense, presented no evidence on defendant's behalf, and chose not to make a closing argument to the jury. This court, finding that the defense counsel deprived Hattery of the right to have the issue of his guilt or innocence presented to the jury as an adversarial issue, concluded that defendant was denied the effective assistance of counsel without applying the two-prong *Strickland* test and ordered a new trial.

Defendant's contention that the defense tactics employed by his counsel are analogous to those employed by the defense counsel in *Hattery* cannot withstand even the most superficial scrutiny.[1] The record reveals that the instant defendant's counsel was his advocate throughout the proceedings. He presented both opening and closing arguments; cross-examined virtually all of the State's witnesses; presented several witnesses,

---

[1]The State suggests that since this court's holding in *Hattery* was limited by *People v. Johnson*, 128 Ill. 2d 253 (1989), *Hattery* must be narrowly construed and should not control our analysis. As we reject defendant's argument that *Hattery* is analogous, it is unnecessary to explore the extent to which *Johnson* limits that holding.

including the defendant, on the defendant's behalf; objected often and strenuously to the admission of adverse evidence; and moved for a mistrial on several occasions. It is untenable to suggest that the proceedings below approached the adversarial breakdown of the *Hattery* proceedings, where defense counsel acted not as an advocate for the accused but as a proponent for the prosecution. Accordingly, we reject defendant's invitation to discard the two-prong *Strickland* test in reviewing his ineffective assistance claim.

We turn, then, to an examination of the first prong of the *Strickland* test—whether defense counsel's performance fell below an objective standard of reasonableness. Defendant, relying on *People v. Chandler*, 129 Ill. 2d 233 (1989), argues that it did. Chandler was charged with murder, residential burglary, and arson. After his arrest, he made a statement, introduced at trial, in which he admitted to breaking into the victim's home, but stated that it was his codefendant who had stabbed the victim. Chandler's trial counsel presented no witnesses on his behalf and Chandler himself did not testify. During closing argument, defense counsel conceded that Chandler had entered the victim's house, but argued that he did not stab the victim.

This court held that defense counsel's performance in *Chandler* amounted to ineffective assistance of counsel. The *Chandler* court reasoned that, even if counsel had succeeded in persuading the jury that defendant did not kill the victim, the jury was still instructed to find defendant guilty of murder under the law of accountability for felony murder. *Chandler*, 129 Ill. 2d at 246-47. Thus, the *Chandler* court concluded that the jury, having been instructed on both felony murder and accountability, had no choice but to find defendant guilty of murder, residential burglary and arson.

In the instant case, as in *Chandler*, defense counsel did not vigorously challenge the prosecution's claim that defendant participated in the robbery of the victim. Defendant argues that his counsel's alleged concession of his guilt in the robbery during closing argument, *i.e.*, counsel's statement that "if he's [defendant's] guilty of anything, he's guilty of robbery," should compel us to conclude that he received ineffective assistance of counsel.

However, *Chandler* does not mandate a finding of ineffective assistance of counsel in the instant case. Ineffective-assistance-of-counsel claims must be determined on a case-by-case basis. Indeed, the Supreme Court cautioned in *Strickland* that "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066. We reiterate here that ineffective-assistance-of-counsel claims must be viewed under the totality of the circumstances of each individual case.

We also note that defendant has mischaracterized this court's holding in *Chandler*. The court's finding of ineffective assistance did not rest exclusively on Chandler's counsel's alleged failure to develop a theory of innocence. Rather, the *Chandler* court further observed that the defense counsel's performance was deficient because he failed to cross-examine several key prosecution witnesses; cross-examined others in an extremely conclusory manner; and called no witnesses to testify, including defendant, even though counsel had asserted that defendant would do so during opening argument.

In contrast, defense counsel in the instant case aggressively cross-examined virtually every witness for the prosecution and called several witnesses on defendant's behalf in an effort to undermine the credibility of

the State's witnesses and to bolster that of the defendant. Ultimately, it was the defendant's own statements, both to the FBI and on the witness stand, and not the actions or strategy of his counsel, which undermined any claim of innocence that defendant may have had. If a defendant enters a not-guilty plea in the face of overwhelming evidence of his guilt, we are unwilling to find that his counsel was ineffective simply because he failed to contrive a leak-proof theory of innocence on defendant's behalf. To do so would effectively require defense attorneys to engage in fabrication or subterfuge.

Here, defense counsel sought to minimize his client's admitted involvement in the robbery scheme and to shift the blame for the robbery and murder onto Jean Rogoz, who had voluntarily accompanied defendant to the crime scene. Defense counsel aggressively attacked the credibility of Jean Rogoz and portrayed her as a calculating cocaine addict who seduced defendant into assisting her in a robbery during which she killed the victim. It is apparent that defense counsel sought to convince the jury that defendant's minimal involvement in the scheme warranted either a finding of innocence or a conviction for robbery only. While this strategy was risky, it was strategy nonetheless, and perhaps the only strategy which could have been seriously pursued given defendant's admissible incriminating statements and the overwhelming evidence of his guilt. Defendant now contends that his trial counsel should have presented a reasonable doubt theory, *i.e.*, defendant played no role whatsoever in the crime which Jean Rogoz perpetrated. However, it is arguable that that strategy would have been even less credible and less likely to succeed than the one his attorney actually pursued. Under the circumstances of this case, defense counsel's performance was not deficient with respect to his proffered defense theory.

Defendant further contends that his counsel was ineffective for failing to challenge defendant's eligibility for the death penalty during the eligibility phase of the sentencing hearing.

During this phase, the State argued that defendant was eligible for the death penalty based on the aggravating factor listed in section 9—1(b)(6) of the Criminal Code of 1961, *i.e.*, killing another individual during the course of a felony. In order to prove defendant eligible under this section, the State had to prove beyond a reasonable doubt that (1) defendant had attained the age of 18 or more at the time of the offense and (2) the victim was killed during the course of another felony and defendant acted with the intent to kill the victim or with the knowledge that his acts created a strong probability of death or great bodily harm to the victim. 720 ILCS 5/9—1(b)(6) (West 1994). Toward this end, the State introduced defendant's birth certificate and the jury verdicts finding defendant guilty of murder and guilty of armed robbery.

Defense counsel declined to make an opening statement in the eligibility phase, presented no evidence, and made no argument against a finding of eligibility for the death penalty. After taking judicial notice that he was present when the jury verdicts were returned and that judgment was entered on those verdicts, the sentencing judge found that defendant was eligible for the death penalty.

Defendant claims on appeal that his counsel's inaction, especially his failure to contend that defendant was ineligible for the death penalty because he did not have a culpable mental state at the time of murder, constitutes ineffective assistance of counsel. The State responds that his counsel's actions were not ineffective, given that any argument in opposition to eligibility was doomed to fail and that defendant cannot possibly show

that he suffered prejudice under the second prong of *Strickland.*

We agree with the State. Defendant cannot show, under the second prong of *Strickland,* that there is a reasonable likelihood that, but for counsel's inaction, the result of the eligibility proceeding would have been different. In *People v. Johnson,* 149 Ill. 2d 118 (1992), the jury was charged with instructions which included intentional murder, knowing murder and felony murder, whereupon it returned a general verdict. The sentencing judge took judicial notice of the jury's verdict and found defendant eligible for the death penalty. Defendant argued that the trial court failed to make any finding that defendant acted with the intent necessary to find him eligible under the statutory aggravating factors for felony murder. This court rejected defendant's argument:

> " ' "[W]here an indictment contains several counts arising out of a single transaction, and a general verdict is returned the effect is that the defendant is guilty as charged in each count, and if the punishment imposed is one which is authorized to be inflicted for the offense charged in any one or more of the counts, the verdict must be sustained." ' " *Johnson,* 149 Ill. 2d at 157, quoting *People v. Thomkins,* 121 Ill. 2d 401, 455-56 (1988).

The *Johnson* court thus concluded that the general verdict raised the presumption that the jury found the defendant guilty of intentional murder.

*Johnson* undermines defendant's claim that, had his attorney challenged his eligibility, the sentencing judge would have found that he lacked the requisite intent under the aggravating felony murder factor and was not eligible for the death penalty. After taking judicial notice that he was present when the jury verdicts were returned and that judgment was entered on those verdicts, the sentencing judge below ruled that defendant was eligible for the death penalty. Since the jury

verdicts encompassed the necessary finding of intent, and since the trial judge took judicial notice of these verdicts, his conclusion that defendant acted with the requisite intent to be eligible for the death penalty cannot be assailed. See *Johnson,* 149 Ill. 2d at 157.

Moreover, we note that the sentencing judge heard the overwhelming evidence against defendant at trial. In finding the defendant guilty of first degree murder, the jury rejected the notion that defendant was not the primary actor in the victim's death. There can be little doubt that the trial judge did as well. Indeed, prior to handing down defendant's sentence, the trial judge stated:

> "I have listened to the evidence along with the jury. *** [T]he initial mover, the sole mover and almost the total mover in all of the acts that culminated in the death of Danny Schneider were perpetrated by the defendant Mr. Shatner. *** So let me set the facts straight as I view the facts. I believe that you did it from the get go. You planned it. *** You chocked [*sic*] him. You have beat him. And the worse [*sic*] part about the whole thing, is then you set him on fire. That, Mr. Shatner, is outrageous."

From these comments, it is apparent that defendant's contention that his eligibility hearing might have been different had his counsel contested eligibility is speculative at best. Defendant thus cannot satisfy the prejudice prong of the *Strickland* test, and his claim of ineffective assistance of counsel at the eligibility phase must be rejected.

## II. Denial of Defendant's Right to Cross-Examine a Witness for the Prosecution

Defendant next argues that the trial court denied him his sixth amendment right to confront and cross-examine witnesses against him where the court limited his cross-examination of Jean Rogoz. During cross-examination of Rogoz, defense counsel asked her whether the victim had stayed at Joaquin's house the

night prior to his death. She responded that he had not. The following exchange then occurred:

"Q. Do you recall that he was not there that evening?

A. Right.

Q. So, it is your testimony that he came to pick you up the next morning?

A. I called him to come get me.

Q. Do you ever remember telling a police detective and that would be McLaughlin that you had stayed overnight there with Danny Schneider and had spent the evening of August 31st to September 1st using drugs?

A. The first time I went in, I didn't tell them the whole truth.

Q. My question is, do you remember telling the police officer—

A. I don't remember telling her.

Q. Let me show you something that might refresh your recollection.

MR. GOEBEL. Objection, judge.

THE COURT: Sustained. You can perfect it with the officer.

MR. CHERONIS: I would think I could test her recollection with anything.

THE COURT: No, not with that. Those are the detective's words."

Defendant contends that, because the trial court sustained the objection to the introduction of the police report, defense counsel was unable refresh Rogoz's recollection as to her prior statements to the detective about what had occurred on the evening on August 31. Since he could not refresh Rogoz's recollection, defendant continues, the trial court frustrated his attempt to compel Rogoz to admit that she had made a prior inconsistent statement, *i.e.*, that the victim stayed at Joaquin's residence the evening before his death. Defendant maintains that the trial court thus violated his right to confront a key prosecution witness, entitling him to a new trial.

The record, however, belies defendant's contention

that he was merely attempting to refresh Rogoz's recollection with the introduction of the detective's report. Instead, it reveals that defendant sought to impeach her with the report. As the trial court properly recognized, once Rogoz testified that she did not remember giving the particular statement to the detective, defendant could only impeach her through the testimony of the detective to whom she allegedly made the statement.[2] Defense counsel could not attempt to impeach Rogoz with the detective's written statement. See *People v. Lucas*, 132 Ill. 2d 399, 430 (1989).

Even assuming, *arguendo*, that defendant merely sought to refresh Rogoz's recollection with the detective's statement, he failed to lay a proper foundation in attempting to do so. It is true, as defendant contends, that a police report may be used to refresh recollection. *Rigor v. Howard Liquors, Inc.*, 10 Ill. App. 3d 1004, 1010 (1973). However, it is fundamental that a witness' memory can be refreshed only after it has been established that the witness has no memory concerning the facts in question. *People v. Kraus*, 377 Ill. 539, 545 (1941). If a witness has testified that his memory is exhausted, a written memorandum may be used to refresh and assist his memory, but the manner and mode of refreshing a witness' memory rests within the discretion of the trial court. *People v. Van Dyk*, 40 Ill. App. 3d 275, 279 (1976).

In the instant case, defendant's cross-examination of Rogoz did not establish that her memory was exhausted or that she needed the detective's report to refresh her recollection as to the events which took place the evening of August 31. Rather, Rogoz testified that she did

---

[2]It should be noted that defendant did attempt to perfect the impeachment during his cross-examination of the detective to whom Rogoz allegedly made the prior inconsistent statement. The detective testified that Rogoz had not, in fact, made the alleged inconsistent statement.

not recall making one particular statement to a police detective. That, in and of itself, was not sufficient to fulfill the foundational requirement that the witness' memory had been exhausted. Thus, the trial court did not abuse its discretion by refusing to allow defense counsel to refresh Rogoz's recollection with the detective report.

### III. Validity of Defendant's Waiver of a Jury for Sentencing

Next, defendant claims that his waiver of his right to be sentenced by a jury was not knowing and intelligent because the trial court failed to admonish him that one juror could prevent the imposition of the death penalty. We disagree.

This court has repeatedly held that a defendant need not be expressly advised of the nonunanimity rule, *i.e.*, that the vote of a single juror will preclude the imposition of the death penalty. *People v. Ramey*, 152 Ill. 2d 41, 59 (1992); *People v. Erickson*, 117 Ill. 2d 271, 295-96 (1987). Moreover, we have further declined to impose a requirement that the trial court advise the defendant that the jury's decision to impose the death penalty must be unanimous. *Ramey*, 152 Ill. 2d at 59; *People v. Evans*, 125 Ill. 2d 50, 89-90 (1988).

Defendant raises no arguments which persuade us to reconsider these decisions. Our review of the record reveals that a valid jury waiver occurred insofar as the trial court explained to defendant that he was waiving the right to have the jury consider the capital sentencing issues and that the sentencing decision would, therefore, be made by the court alone. See *Ramey*, 152 Ill. 2d at 59. Accordingly, we reject the defendant's jury waiver argument.

### IV. Introduction of Gang Affiliation Evidence

Defendant next claims that he was denied his due

process right to a fair sentencing hearing and his first amendment right of freedom of association where the State introduced evidence of his gang affiliation. Relying on *Dawson v. Delaware,* 503 U.S. 159, 117 L. Ed. 2d 309, 112 S. Ct. 1093 (1992), defendant alleges that his death sentence should be vacated since this evidence was not relevant to any issue at sentencing.

Initially, the State counters that defendant has waived this argument on appeal by failing to properly object to its introduction at trial. During the State's examination of Benjamin Lieu, who shared a cell with defendant while they were incarcerated in the Cook County jail, the following colloquy occurred:

> "Q. Mr. Lieu, could you please tell the court whether or not you ever talked about any gang affiliation with defendant?
>
> A. Like can you be more specific, like talk about a gang activity in the cell or—
>
> MR. CHERONIS: *Objection to that.*
>
> A. O [*sic*] over over.
>
> THE COURT: Overruled.
>
> MR. GOEBEL: Q. Did you know whether or not he belonged to a gang?
>
> A. Yes, he does.
>
> Q. How do you know that?
>
> A. Because he has a tattoo on his back.
>
> Q. What kind of tattoo?
>
> A. A crown.
>
> Q. Do you know what that symbolizes?
>
> A. Yes.
>
> Q. What [is] that?
>
> A. A particular gang.
>
> Q. What gang?
>
> A. Gaylord.
>
> Q. Did he claim he had any rank in the Gaylord Gang?
>
> A. Yes." (Emphasis added.)

The State maintains that defense counsel only objected to the introduction of gang *activity* evidence and not to the introduction of gang *affiliation* evidence.

Although defense counsel's objection lacked specificity, we will assume, *arguendo*, that defense counsel's objection went to the State's introduction of gang affiliation testimony in general, not merely the introduction of gang activity testimony, and that defendant properly preserved his objection.

In *Dawson*, the Supreme Court held that a defendant's first amendment right to freely associate is violated when the State introduces evidence during a death penalty hearing regarding a defendant's gang affiliation, when it is irrelevant to proving any aggravating circumstances. The *Dawson* court further held, however, that the erroneous introduction of such gang affiliation evidence is subject to a harmless error analysis. *Dawson*, 503 U.S. at 168-69, 117 L. Ed. 2d at 319, 112 S. Ct. at 1099.

We conclude that, if error occurred, the State's introduction of the gang affiliation evidence was harmless beyond a reasonable doubt. See *People v. Ward*, 154 Ill. 2d 272 (1992). The sentencing judge considered numerous aggravating factors in the instant case, including the defendant's principal role in the acts which culminated in the victim's death; the premeditated nature of the murder; the fact that the defendant set the victim on fire; the defendant's criminal history; and the defendant's lack of remorse after the crime. The contrary mitigating evidence was minimal, consisting of testimony that defendant felt unloved as a child, began experimenting with drugs at an early age, and that, prior to his arrest, was gainfully employed and had treated his current girlfriend well. Moreover, the testimony concerning defendant's gang affiliation was brief and isolated, and the sentencing judge did not even mention it during his sentencing summation. Therefore, we conclude that the introduction of defendant's gang affiliation evidence was harmless beyond a reasonable doubt.

V. Introduction of Religious Practices Evidence

Defendant next contends that he was denied his first amendment right to the free exercise of his religion where his religious activities were introduced in aggravation during his sentencing hearing. Specifically, defendant complains of his cellmate's, Benjamin Lieu's, testimony concerning the religious rituals defendant practiced and the religious materials defendant read while in their cell.

The State argues that defendant failed to object to the introduction of this testimony and, as a result, he has waived the issue for purposes of appeal. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (holding that to properly preserve an issue for review, both a trial objection and a written post-trial motion are required). Our review of the record reveals that defendant failed to make a contemporaneous objection to the introduction of his religious activities at trial. We therefore find any error waived.

Defendant contends, however, that this court should review his free exercise claim under the plain error doctrine. Even where a defendant fails to properly preserve an issue for review, plain errors affecting substantial rights may be considered if (1) the evidence is closely balanced or (2) the error is of such magnitude that it deprives the defendant of a fair sentencing hearing. *People v. Fields*, 135 Ill. 2d 18, 60 (1990). Since we conclude that the trial court did not err in admitting the religious activities evidence, we shall not review defendant's claim under the plain error rule.

In *Dawson*, the United States Supreme Court emphasized that there is no *per se* bar to the admission of evidence concerning beliefs or activities which are protected under the first amendment; rather, the evidence is admissible if it bears a relationship to the charged crime. *Dawson*, 503 U.S. at 165-66, 117 L. Ed. 2d at 317, 112 S. Ct. at 1098.

*Dawson* indicates, then, that evidence of constitutionally protected religious activities is admissible if used for something more than general character evidence. Here, the testimony concerning the religious rituals defendant practiced and the religious materials he read was not introduced as mere character evidence; rather, it was "tied" to the murder of his victim. See *Dawson*, 503 U.S. at 166, 117 L. Ed. 2d at 317, 112 S. Ct. at 1098. At trial, Jean Rogoz testified that when she asked defendant why he set the mattress on fire and burned the victim, defendant replied, "To free his spirit." Similarly, Lieu testified at trial that defendant told him that he hit the victim several times because the victim's spirit was very strong. At the sentencing hearing, Lieu testified that defendant chanted and tossed an eagle feather about while naked in his cell, claiming that these actions would cause "the spirits to come." Not only did Lieu's testimony at the sentencing hearing corroborate Rogoz's testimony at trial, it also shed light on defendant's peculiar statements following the crime. The evidence suggests that defendant's religious beliefs informed his actions during the murder of the victim. As such, we find unpersuasive defendant's assertion that the religious activities evidence introduced at the sentencing hearing constituted nothing more than irrelevant character evidence held impermissible under *Dawson*. The trial court thus did not err in admitting this evidence in aggravation at the sentencing hearing.

## VI. Defense Counsel's Failure to Object to Aggravation Evidence

Defendant next argues, in anticipation of this court's conclusion that his counsel failed to properly object to the introduction of the gang affiliation or religious activities evidence, that his counsel was ineffective for his failure to do so. Since we have previously concluded that defense counsel's objection to the gang affiliation

evidence was sufficient to preserve the issue for review, we need only address whether defendant's counsel was ineffective for his failure to object to the introduction of the religious activities evidence.

As previously noted, claims of ineffective assistance of counsel are examined under the two-prong test established in *Strickland*. Under *Strickland*, a defendant must show both that his counsel's performance fell below the objective standard of reasonableness and that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

Since we have determined that evidence concerning defendant's religious activities was admissible at the sentencing hearing, defendant cannot argue that it was unreasonable for his attorney to fail to object to its admission. See *People v. McCarthy*, 213 Ill. App. 3d 873, 887 (1991) (noting that whether to object is a trial strategy, and to object when it would be overruled would be futile). In that defendant cannot meet his burden under the first prong of the *Strickland* test, his ineffective-assistance claim must be rejected.

### VII. Defendant's History of Drug Abuse Used as Aggravation

Defendant further claims that he was denied a fair sentencing hearing where the sentencing judge failed to consider defendant's drug abuse history as a mitigating factor and instead deemed it to be aggravating.

This court has never held, and defendant directs us to no cases in which an Illinois court has held, that a sentencing judge must consider defendant's drug use as a mitigating factor in sentencing decisions, and we decline to so hold here. Simply because the defendant views his drug abuse history as mitigating does not require the sentencer to do so. In *People v. Ward*, 154

Ill. 2d 272 (1992), we considered an argument analogous to the one defendant now advances. The *Ward* defendant claimed that the evidence of his troubled childhood was necessarily mitigating in nature. In rejecting that argument, this court stated:

> " 'Defendant endeavors to persuade us that, because the [Eddings] Court has said a sentencer cannot refuse to consider relevant mitigating evidence presented by a defendant, it has held that a sentencer must give it some mitigating weight. We disagree with the conclusion. The Court has held only that when the sentencer is a judge, the sentencer cannot refuse to hear evidence introduced as mitigating, and cannot refuse to consider whether that evidence is in fact mitigating on the basis that the sentencing judge believes the evidence is barred by law from being considered as mitigating.' " *Ward*, 154 Ill. 2d at 337, quoting *People v. Henderson*, 142 Ill. 2d 258, 338 (1990).

These observations are equally incisive here. Defendant does not claim that the sentencing judge refused to hear or believed he was somehow precluded from viewing the drug abuse history evidence as mitigating. Rather, defendant essentially asserts that the sentencer should have found that defendant's drug abuse history in part explained his criminal behavior. Underlying this premise is that since drugs are partly to blame for his actions, the defendant is somehow less culpable and should not suffer the ultimate penalty for his criminal behavior. Simply stated, the sentencing judge was under no legal obligation to subscribe to this suggestion. To the contrary, the sentencing judge was free to conclude, under the circumstances, that defendant's drug history simply had no mitigating value but was, in fact, aggravating. See *Ward*, 154 Ill. 2d at 337. Accordingly, we reject defendant's claim of error.

VIII. Excessiveness of the Death Penalty

Defendant next asserts that his death sentence is excessive and inappropriate given the evidence of his rehabilitative potential and other mitigating evidence presented at the sentencing hearing. We disagree.

Analysis of the propriety of the death sentence requires an individualized consideration of the circumstances of the offense and of the character and background of the offender. *Eddings v. Oklahoma*, 455 U.S. 104, 110-12, 71 L. Ed. 2d 1, 8-9, 102 S. Ct. 869, 874-75 (1982); *People v. Strickland*, 154 Ill. 2d 489, 534 (1992). In deciding whether imposition of the death sentence in a particular case is excessive, this court examines whether the circumstances of the crime and the character of the defendant are such that the deterrent and retributive functions of the ultimate sanction will be served by imposing the death penalty. *People v. Tye*, 141 Ill. 2d 1, 29 (1990).

The evidence presented at trial established that defendant committed a cold-blooded, unprovoked murder: he strangled and beat the victim and then set him on fire in a scheme to steal his VCR so that he could purchase cocaine. Additionally, the State presented significant evidence in aggravation. Defendant's criminal history included theft, criminal damage to property, battery and resisting arrest. He showed little, if any, remorse for his actions and, since being incarcerated, he has been involved in physical altercations and a shank was found in his cell.

In contrast, the evidence defendant presented in mitigation was minimal, consisting of testimony that defendant felt unloved as a child, that he began sniffing glue at the age of 13, and that, during the four years he had fled the jurisdiction, defendant procured gainful employment and a steady girlfriend. Under the circumstances, the trial court's determination that the aggravation evi-

dence outweighed the mitigation evidence is supported by the record.

Defendant nevertheless urges this court to find that the circumstances of the instant case are similar to those in a limited number of cases in which this court has found a death sentence excessive where the offenses were triggered by or resulted from substantial extenuating circumstances. See *People v. Walcher*, 42 Ill. 2d 159 (1969); *People v. Crews*, 42 Ill. 2d 60 (1969); *People v. Johnson*, 128 Ill. 2d 253 (1989). We decline to do so. The record provides no support for defendant's assertion that he could not control his actions at the time of the murder because of the excessive quantity of cocaine he had ingested. To the contrary, the calculated manner in which the murder was perpetrated reveals that defendant was in control of his faculties at the time of the offense. We therefore conclude that the trial court did not err in imposing the death penalty under these circumstances.

IX. Constitutionality of the Death Penalty

Lastly, defendant contends that the Illinois death penalty statute is unconstitutional because (1) it allows the sentencer to weigh a vague aggravating factor, namely, "[a]ny other reason" (Illinois Pattern Jury Instructions, Criminal, No. 7C.06 (3d ed. 1992)) a defendant should be sentenced to death; (2) it places the burden of proof on the defendant and precludes meaningful consideration of mitigation; and (3) it does not sufficiently minimize the risk of arbitrarily or capriciously imposed death sentences. This court has considered and rejected these claims repeatedly in other contexts. See, *e.g.*, *People v. Taylor*, 166 Ill. 2d 414, 439 (1995) (rejecting the argument that a sentencer's consideration of nonstatutory aggravating factors during the second stage of a capital sentencing hearing results in the arbitrary imposition of the death sen-

tence); *People v. Page*, 155 Ill. 2d 232, 283 (1993) (holding that the death penalty statute does not preclude a sentencer from giving meaningful consideration to mitigation evidence); *People v. Kubat*, 94 Ill. 2d 437 (1983) (concluding that the death penalty statute ensures adequate safeguards to prevent the arbitrary or capricious imposition of the penalty). Defendant raises no new arguments to persuade us to reconsider these holdings.

## CONCLUSION

For the reasons stated, the judgment of the circuit court of Cook County is affirmed. The clerk of this court is directed to enter an order setting Tuesday, January 14, 1997, as the date on which the sentence of death entered in the circuit court of Cook County is to be carried out. The defendant shall be executed in the manner provided by law. 725 ILCS 5/119—5 (West 1994). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of the Stateville Correctional Center, and to the warden of the institution where defendant is confined.

*Affirmed.*