(No. 80643.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JAMES E. REID, Appellant.

*Opinion filed December 18, 1997.*

MILLER, J., concurring in part and dissenting in part.

Charles M. Schiedel, Deputy Defender, of Spring-

field, and Steven Clark, Assistant Defender, of Chicago, both of the Office of the State Appellate Defender, and Danielle Kellstrom, law student, for appellant.

James E. Ryan, Attorney General, of Springfield, and Charles Reynard, State's Attorney, of Bloomington (Barbara A. Preiner, Solicitor General, and William L. Browers, Arleen C. Anderson and Penelope M. George, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE HEIPLE delivered the opinion of the court:

A jury convicted defendant of first degree murder (720 ILCS 5/9—1(a) (West 1994)). The jury then found that defendant was eligible to be sentenced to death because the murdered individual was killed in the course of the felony of home invasion. 720 ILCS 5/9—1(b)(6) (West 1994). Defendant waived a jury for sentencing. After considering aggravating and mitigating factors, the circuit court determined that there were no mitigating factors sufficient to preclude imposition of the death penalty, and accordingly sentenced defendant to death. 720 ILCS 5/9—1(h) (West 1994). Defendant's death sentence has been stayed pending review by this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d R. 609(a). We affirm defendant's conviction, but vacate his death sentence and remand for resentencing.[1]

FACTS

The following evidence was adduced at trial. Defendant testified that he met the victim, Janice Wright, in Springfield, Illinois, in 1990. In 1993, he moved to an apartment in Bloomington, Illinois. Sometime in 1994,

---

[1]The same jury also convicted defendant of aggravated battery against Jose Alfredo Aviles. Defendant has not challenged this conviction on appeal.

Wright moved to Bloomington and began living with defendant in the same apartment, which the two jointly rented.

In February 1995, Wright moved out of the apartment and into the Home Sweet Home Mission in Bloomington. On February 28, the circuit court entered an emergency order of protection prohibiting defendant from having any contact with Wright. On March 9, the court entered a plenary order of protection granting exclusive possession of the apartment to Wright and prohibiting defendant from entering or remaining at the apartment.[2] The plenary order gave defendant permission to enter the apartment to retrieve his belongings on March 11, 1995, between 10 a.m. and 2 p.m. in the presence of police.

Defendant testified that on March 11 he went to the apartment unaccompanied by police. He and Wright talked for awhile, and then Wright asked him to help her move a washer and dryer which she had purchased from a nearby neighbor into the apartment. Defendant went to the neighbor's house, but found nobody home. He told Wright that he would return the next day.

On March 12, defendant again went to the apartment unaccompanied by police. As he approached the apartment, Wright met him outside. The two talked for 20 to 25 minutes on the front steps. Defendant asked Wright if she could give him some money to pay rent to a friend with whom he was living. Wright told him that she had no money, but that he could have some rings he had given her previously. Defendant told her he did not want to take the rings.

---

[2]An emergency order of protection may issue before respondent has answered the petition or appeared, but is effective for no more than 21 days. 750 ILCS 60/217, 220 (West 1994). A plenary order of protection may not issue until respondent has answered or is in default, but may be effective for up to two years. 750 ILCS 60/219, 220 (West 1994).

Defendant testified that two individuals, Jessica Chavez and Alfredo Aviles, then arrived at the apartment. As Chavez and Aviles came onto the porch, a third person, Monica Aceves, came out of the apartment holding an infant. Wright, Chavez, and Aceves then went into the apartment and brought out bags of defendant's clothes, which defendant put into his car. Defendant then asked Wright if she had seen a jacket of his which was missing. She told him he could go look for it in the basement, which was accessed by an outside door. She gave him the key to the door, and he entered the basement and looked, but did not find the jacket. After he returned to the front of the house, he accompanied Wright to a nearby pay phone where Wright made a call.

When Wright completed her phone call, she and defendant went back to the apartment. Defendant then began asking Chavez, Aviles and Aceves to identify their ethnic origin. Wright became upset and told defendant to stop bothering her friends. Defendant testified that he then entered the apartment and went to the bedroom to look for some gold coins he had placed in a vase. Wright shouted to defendant that she would find the coins for him, so he left the bedroom and went into the living room where Wright was. Defendant testified that, upon entering the living room, he walked over to a shelf which held cassette tapes, and asked Wright, "Where is the Mariah Carey tape at?" and that Wright responded, "You can't have that tape."

Defendant testified that at this point, he noticed that Wright had a "box cutter" or "razor" in her hand. He testified that he was afraid because he had seen Wright use a knife before. For example, he testified, three years earlier Wright had gotten into an argument with another woman in a tavern and had pulled out a knife and that he had to stop the fight. He also testified that once,

after an argument with him, Wright had cut her own wrists. Finally, he testified that Wright had told him that she had "cut up" her first husband "pretty bad."

Defendant testified that as soon as he noticed the box cutter in Wright's hand, she bent over and picked up a hammer that was lying on the floor, and that he then said, "What are you doing? Put that hammer down." He testified that he then grabbed both of Wright's hands and struggled with her, trying to take the hammer and box cutter away. Wright then began screaming to the other people to call the police, and Chavez and Aviles, who were still out on the porch, began screaming as well.

Defendant testified that while he was struggling with Wright, Aviles entered the living room and struck him on the left side of his face and then held him from behind. Defendant testified that then, "I just gave it all and I came around like that and my elbow hit something and the shock came all the way through my left hand and the next thing I remember I was out on the front porch screaming at the ladies to get away from me." Defendant testified that "it was like waking up from a bad dream or something." He testified that he did not recall ever having the hammer.

Monica Aceves testified as follows. On March 12, 1995, she was in Wright's apartment when defendant arrived. From the living room, she could see that Wright and defendant were talking on the porch. Some time later her mother, Jessica Chavez, arrived with Alfredo Aviles. Wright then gave defendant some bags of clothes, which defendant put in his car. As Wright and defendant then began arguing over some cassette tapes, Aceves went into the bathroom. From the bathroom, she heard defendant say, "Were you going to use this on me?" Aceves then came back into the living room and saw defendant push Wright over the armrest of a couch.

After Wright got up, defendant started hitting her with a hammer. Aceves testified that defendant used the hammer to hit Wright in the head, on the back, and "just everywhere." Screaming, Wright tried to get up and take the hammer away from defendant, but she could not. Aceves then began screaming for defendant to stop, but he continued hitting Wright. Soon, Wright stopped screaming and moving, but defendant continued hitting her.

Aceves further testified that during this time, Chavez entered the living room and screamed for defendant to stop, and then yelled for the neighbors to call the police. Aviles then entered the living room and tried to get the hammer away from defendant. Defendant struck Aviles with the hammer, bloodying his face. Aviles then ran outside to call for help. Shortly thereafter, defendant left the apartment and chased Aviles down the street with the hammer. He then returned to the apartment and resumed hitting Wright with the hammer. Chavez screamed at him to stop and to leave Wright alone. Defendant then took the hammer and went behind the apartment, and soon returned without the hammer. At that point, police arrived, and defendant walked toward them with his hands raised and was taken into custody.

Jessica Chavez testified as follows. When she and Alfredo Aviles arrived at Wright's apartment on March 12, 1995, Wright was talking with defendant on the front porch. Wright then began giving defendant bags of clothing. Because defendant believed one of his jackets was missing, he went around to the basement to look for it. When he came back, he told Wright he needed money, and then became upset because she said he could not have a television and videocassette recorder from the apartment. He then asked for some cassette tapes. Wright told him to wait outside and she would get some

of the cassettes for him, but defendant then followed Wright as she went inside.

A short time later, Chavez heard her daughter, Monica Aceves, screaming, "You're killing her." Chavez then looked in the living room and saw defendant holding Wright on her upper back and hitting her with a hammer. Chavez recognized the hammer as one she had laid on the floor after hanging some pictures for Wright. Chavez screamed at defendant to stop and yelled to Aviles to come help Wright. After Aviles entered the living room, Chavez saw him fall over the couch with his face bloody. She then yelled for Aviles to leave and get help. After Aviles left, defendant continued swinging the hammer at Wright. Chavez again told defendant to stop. Defendant yelled at Chavez and Aceves to leave the house. Defendant then ran out of the apartment with the hammer and went towards the pay phone which Aviles was using. Aviles then fled and defendant chased him for a short while. Defendant then, returned to the apartment and resumed hitting Wright on the head with the hammer. Soon, defendant ran outside and went behind the apartment with the hammer. When he returned, he did not have the hammer.

Jose Alfredo Aviles testified as follows. On March 12, 1995, he went to Janice Wright's apartment with Jessica Chavez. Upon arriving, he went to the front porch and stood there. After some time, he heard a woman screaming. He went to the front door of the apartment and saw Wright lying on the floor motionless and defendant standing over her, hitting her. When Aviles tried to stop defendant from hitting Wright, defendant hit Aviles in the head with something, drawing blood immediately. Aviles then ran out of the apartment to a pay phone and called for help. Because he was not sure if the operator understood his English, Aviles left the phone to get more help, and did not notice whether anyone chased him.

Wright was transported to a hospital. When she arrived, she had no heartbeat and was not breathing. Doctors observed multiple blows to her head, which tore open her brain cavity. After unsuccessful attempts at resuscitation, she was pronounced dead. Police later found a hammer underneath a pile of leaves in the back yard at the apartment. A utility knife with a retractable blade was found in the living room.

The jury was given the option of finding defendant guilty of second degree murder based on an unreasonable belief in the necessity of self-defense (720 ILCS 5/9—2(a)(2) (West 1994)), but instead convicted defendant of first degree murder (720 ILCS 5/9—1(a) (West 1994)). The jury then found defendant eligible for the death sentence based on the statutory aggravating factor that the murder was committed in the course of the felony of home invasion (720 ILCS 5/9—1(b)(6) (West 1994)).

Defendant waived a jury for sentencing. In aggravation, the State presented evidence that defendant pled guilty in 1986 to battery against his then-girlfriend, and was convicted in 1987 of aggravated battery against another girlfriend, whom he had beaten with a tire iron. The State also presented evidence that defendant had punched another girlfriend in the chest and mouth, and had slapped and kicked the victim in the instant case on an occasion prior to her murder.

In mitigation, defendant produced evidence of a psychiatric examination he underwent in 1988 in connection with his conviction for the tire-iron beating of his previous girlfriend. The examining psychiatrist diagnosed defendant as suffering from post-traumatic stress disorder as a result of a 1983 beating he received at the hands of prison inmates while defendant was employed as a correctional officer. The psychiatrist testified that defendant's disorder causes him to become frightened

easily and to react violently when he perceives himself as being attacked. Defendant also presented evidence that three weeks before the instant murder, he had attempted suicide with a drug overdose. Two church ministers who had known defendant testified that he was a humble, caring, remorseful person, and a positive team worker.

The court found no mitigating factors sufficient to preclude the imposition of the death penalty, and sentenced defendant to death.

## ANALYSIS

### Trial

*Second Degree Murder*

Defendant first contends that the jury improperly failed to find him guilty of second degree murder when it instead found him guilty of first degree murder. A person commits the offense of second degree murder when he commits the offense of first degree murder and at the time of the killing he believes that his use of force is necessary to prevent imminent death or great bodily harm to himself or another, but his belief is unreasonable. 720 ILCS 5/9—2(a)(2), 7—1 (West 1994). To reduce an offense from first degree murder to second degree murder, the burden is on the defendant to prove that he believed that his use of force was necessary. *People v. Blackwell*, 171 Ill. 2d 338, 357 (1996); *People v. Jeffries*, 164 Ill. 2d 104, 126 (1995). Whether defendant believed, albeit unreasonably, that his use of force was necessary is a question of fact, the determination of which will not be disturbed on appeal if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have reached that determination. *Blackwell*, 171 Ill. 2d at 358.

Defendant contends that he presented evidence from which a rational trier of fact could only have concluded

that he believed, albeit unreasonably, that his use of force against Wright was necessary to prevent imminent death or great bodily harm to himself. He emphasizes his testimony that, immediately prior to their struggle, Wright had the hammer in one hand and a "box cutter" in the other. Defendant contends that, because he knew that Wright had once drawn a knife in a fight, and had told him that she cut her first husband with a knife, he truly believed his use of force against her was necessary to defend himself.

Viewing the evidence in the light most favorable to the prosecution (*Blackwell*, 171 Ill. 2d at 358), we believe that a rational juror could have rejected defendant's claim of self-defense. Defendant was 5 feet 11 inches tall and weighed 245 pounds, while Wright was 5 feet 1 inch tall and weighed 120 or 130 pounds. No witness besides defendant testified that Wright had a knife or hammer in her hand prior to the incident. In recounting the incident to police afterwards, defendant did not mention that Wright was holding a knife. Most compellingly, there was evidence that after defendant began attacking Wright, he left the apartment for a short time and then returned and resumed beating her. Based on this evidence, we hold that the jury's decision not to reduce defendant's offense to second degree murder was rational.

*Ineffective Assistance of Counsel*

Defendant next contends that his trial counsel was ineffective in failing to introduce evidence during the guilt/innocence phase that defendant suffered from post-traumatic stress disorder as a result of having been beaten by prison inmates while working as a correctional officer in 1983. Defendant notes that the trial court granted the prosecution's motion *in limine* to exclude evidence of the beating on the grounds that the incident was too remote in time and character from the

instant offense. In granting the motion, however, the court added that "there may be relevant testimony on the issue of intent and so on that could be introduced regarding [defendant's] actions or mental state *** either immediately before, during, or immediately after the offense." Defendant argues that his attorney therefore should have attempted at trial to introduce evidence of his post-traumatic stress disorder. Defendant asserts that the jury would have been much more likely to reduce his offense to second degree murder if it had known of his disorder, which causes him to become frightened easily and to react hastily to situations which resemble the original trauma.

To prevail on a claim of ineffective assistance of counsel, a defendant must (1) show that his counsel's performance fell below an objective standard of reasonableness and (2) demonstrate a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984); *People v. Shatner*, 174 Ill. 2d 133, 144 (1996). Decisions concerning which witnesses to call at trial and what evidence to present on defendant's behalf ultimately rest with trial counsel. *People v. Madej*, 177 Ill. 2d 116, 148 (1997). As matters of trial strategy, such decisions are generally immune from claims of ineffective assistance of counsel. *Madej*, 177 Ill. 2d at 148. The only exception to this rule is when counsel's chosen trial strategy is so unsound that counsel entirely fails to conduct any meaningful adversarial testing. *Madej*, 177 Ill. 2d at 149.

We conclude that counsel's decision not to introduce evidence of defendant's disorder at trial did not constitute ineffective assistance. First, counsel could reasonably have surmised that the trial court would not allow any evidence that the disorder resulted from the 1983

beating because, in ruling on the motion *in limine*, the court stated merely that it "might" admit evidence of defendant's mental state "immediately" before the offense. Counsel could reasonably have doubted whether a disorder arising from a 1983 incident would have satisfied this condition.

Furthermore, counsel had another sound reason to avoid introducing at trial evidence of defendant's disorder. Almost all of the evidence presented at sentencing concerning defendant's disorder was gathered in connection with defendant's 1987 prosecution and conviction for beating a former girlfriend with a tire iron. Counsel may have feared that using any of this evidence at trial would have allowed the State to disclose to the jury the details of this earlier offense. Defendant counters that such a disclosure would have been unnecessary because he had been diagnosed initially with the disorder in 1983, just after the beating, and so trial counsel could merely have introduced this initial diagnosis, thereby avoiding altogether the testimony associated with defendant's 1987 conviction. The testimony which counsel offered in mitigation at sentencing, however, was much more detailed and current than the original 1983 diagnosis. Counsel could reasonably have believed that only the more recent evidence stood a chance of persuading the jury, but that the risk of exposing defendant's 1987 conviction through use of this evidence outweighed its potential value.

Finally, even if counsel's decision not to introduce defendant's disorder were incompetent, defendant has failed to show that the result of the proceeding would have been different absent this error. The evidence presented at sentencing indicated that defendant's disorder could cause him to react violently when placed in a situation similar to that which caused his original trauma: namely, a beating at the hands of several prison

inmates. Defendant's great size advantage over Wright, coupled with the evidence that he returned to the apartment and continued to beat Wright after she was motionless, make it unlikely that the jury would have found a causal link between his disorder and his attack on Wright. We therefore hold that counsel was not ineffective in failing to introduce at trial evidence of defendant's post-traumatic stress disorder.

Defendant also contends that counsel was ineffective in failing to introduce available evidence that Wright had borrowed the "box cutter" from a friend for protection. Defendant notes that when police found a utility knife on the floor of the apartment after the offense, they mistakenly assumed that it belonged to rescue personnel, and so had it delivered to the fire station with some other rescue supplies. When the rescue workers later discovered the knife with their supplies, they informed police that it was not theirs and returned it. According to a police report filed subsequently, a friend of Wright's told police that Wright had borrowed the knife from him for protection because she was worried that she might have a confrontation with defendant.

Defendant argues that his trial counsel was ineffective in failing to introduce evidence that Wright borrowed the knife. He argues that the jury would have been more likely to reduce the offense to second degree murder if it had heard evidence that Wright had intentionally armed herself against him.

We hold that counsel's decision not to introduce this evidence was within the range of reasonably effective professional assistance. The fact that Wright felt she needed to arm herself for a possible confrontation with defendant might have negatively influenced the jury. The owner of the knife might have testified as to the specific basis for Wright's fear of defendant. Working without the benefit of hindsight, it was within counsel's

discretion to conclude that any evidence of precautionary measures taken by Wright could have unduly prejudiced the jury against defendant.

Furthermore, even if this decision by counsel were error, defendant has not shown a reasonable probability that, but for this error, the jury would have convicted him of second degree murder. Out of four eyewitnesses who testified concerning the fatal struggle, only defendant stated that Wright had the "box cutter" in her hand at the time of the incident. Indeed, even the defendant did not inform police after the offense that Wright was wielding the knife just prior to his attack. Accordingly, it is unlikely that the jury would have given much weight to defendant's subsequent, uncorroborated version of the origin of the struggle even if it had known that Wright procured the knife to protect herself. We thus hold that counsel's decision not to introduce this evidence did not constitute ineffective assistance.

### Exclusion of Battery Conviction

Defendant next contends that the trial court erred in refusing to admit a purported copy of Wright's battery conviction from Shelby County, Indiana. Defense counsel asserted at trial that the conviction was for an incident in which Wright struck a man in the face with her hand. The tendered exhibit, however, listed two persons as defendants, "Nancy Martin" and "Janice Lockridge." The State objected that the evidence was inadmissible because defendant had not proven that Janice Lockridge was Janice Wright. The trial court denied defendant's motion to introduce the conviction.

Evidentiary rulings are within the sound discretion of the trial court and will not be reversed unless the court has abused that discretion. *People v. Boclair*, 129 Ill. 2d 458, 476 (1989). Defendant testified at trial that Wright had once told him that she cut her former husband with a knife in Shelbyville, Indiana. Defendant

testified that he believed that man's name was Ralph Lockridge. An information attached to the Indiana battery conviction tendered by defendant identified the victim of that offense as Raymond Jones. In excluding the evidence, the trial court emphasized two discrepancies in the evidence offered by defendant: first, the victim's name was Janice Wright while the name of the defendant in the battery case was Janice Lockridge; second, defendant testified that Wright's former husband was named Ralph Lockridge, while the victim of the referenced battery was Raymond Jones.

In light of these facts, we do not believe that the trial court abused its discretion in excluding the battery conviction. Defendant's testimony was the sole source of evidence as to other names Wright had used. Defendant's failure to introduce competent, objective evidence that the defendant named in the conviction was in fact Wright, coupled with the discrepancy between the listed victim and defendant's recollection of the name of Wright's former husband, justified the trial court's exclusion of the evidence.

Furthermore, even if we believed that exclusion of the evidence was error, we would hold that the error was not so serious as to warrant reversal of defendant's conviction. Evidentiary errors are harmless if properly admitted evidence overwhelmingly supports defendant's guilt. *People v. Miller*, 173 Ill. 2d 167 (1996). If the jury had been informed that Wright allegedly struck a former husband with her fist, this fact still would not have negated defendant's culpability for her murder, especially since there was evidence that defendant continued beating Wright with the hammer even after she became unable to resist.

Sentencing

*Home Invasion*

The sole aggravating factor advanced by the State

for death penalty eligibility was murder in the course of the felony of home invasion. 720 ILCS 5/9—1(b)(6) (West 1994). The home invasion statute provides, in relevant part, that a person commits the offense when "without authority he or she knowingly enters the dwelling place of another." 720 ILCS 5/12—11(a) (West 1994). Defendant contends that he did not commit the offense of home invasion because both he and Wright rented the apartment in which the murder occurred, and therefore he did not enter the home "of another," but rather entered his own home.

The State responds, citing *People v. Williams*, 222 Ill. App. 3d 129 (1991), that the order of protection in effect against defendant at the time of the murder, which granted "exclusive possession" of the apartment to Wright, rendered the apartment the "dwelling place of another" for purposes of the home invasion statute. In *Williams*, the defendant was charged with residential burglary, an offense which, like home invasion, requires that the defendant enter the dwelling place "of another." 720 ILCS 5/19—3 (West 1994). Like the instant defendant, the defendant in *Williams* was a joint tenant of a residence to which the other tenant had been given exclusive possession by a protective order. The appellate court in *Williams* noted that the Illinois Domestic Violence Act of 1986 (the Act) (750 ILCS 60/214 (West 1994)) provides that the owner of a home may be denied access to the home as a condition of a protective order. *Williams*, 222 Ill. App. 3d at 135. The appellate court held that, in order to effectuate the purposes of the Act, the residential burglary statute must be construed to render a home that "of another" when the defendant is barred from entering the home by a protective order. *Williams*, 222 Ill. App. 3d at 135.

Defendant replies, citing *People v. Moulton*, 282 Ill. App. 3d 102 (1996), that the phrase "of another"

precludes prosecution of a tenant for entering his own home. In *Moulton*, the defendant was charged with home invasion after he entered a residence which he and his ex-wife jointly owned. *Moulton*, 282 Ill. App. 3d at 103. In affirming the trial court's dismissal of the home invasion charge, the appellate court noted that, as originally proposed, the home invasion statute did not include the phrase "of another." *Moulton*, 282 Ill. App. 3d at 105. That phrase was added only after a number of Senators expressed their concerns that parties to domestic disputes would be charged under the statute. See 80th Ill. Gen. Assem., Senate Proceedings, June 28, 1978, at 78-79. Explaining the addition of the phrase, one legislator stated that "[n]ow we have, through the Conference Committee, made a clarification raised by some Senators that would provide that it must be the home of another so you could not commit that offense in your own home." 80th Ill. Gen. Assem., House Proceedings, June 30, 1978, at 135 (statements of Representative Getty).

In drafting the home invasion statute, the legislature thus specifically sought to exclude domestic disputes from the reach of the statute. Given this clear expression of legislative intent, we hold that a defendant does not commit the offense of home invasion when he enters a dwelling which a protective order prohibits him from entering but of which he is an otherwise lawful tenant. The Domestic Violence Act does not in any way purport to affect the interpretation of the phrase "of another" as used in the Criminal Code of 1961 (720 ILCS 5/1—1 *et seq.* (West 1994)). Unless and until the legislature indicates that the Act is meant to supersede the plain import and legislative history of this phrase, we decline to apply the Act in the manner urged by the State. Despite the plenary order of protection requiring that defendant in the instant case refrain from entering the

apartment, the apartment was still being rented by him at the time of the alleged offense, and therefore was not the "dwelling of another."

We note, however, that despite our holding today, persons such as defendant who violate orders of protection will continue to be subject to the full range of punishments available to the State under both the Criminal Code and the Domestic Violence Act. See 750 ILCS 60/223 (West 1994) (providing that violations of protective orders may be prosecuted in conjunction with underlying criminal charges or through separate civil or criminal contempt proceedings).

For the above reasons, we hold as a matter of law that defendant did not commit the offense of home invasion when he entered his own apartment. Consequently, commission of the felony of home invasion cannot serve as an aggravating factor permitting imposition of the death penalty in this case. We therefore affirm the defendant's conviction for first degree murder, but vacate the sentence of death and remand this cause to the circuit court of McLean County for resentencing. In light of this disposition, it is unnecessary for us to address defendant's additional challenges to his original sentencing hearing.

*Conviction affirmed;*
*death sentence vacated;*
*cause remanded.*

JUSTICE MILLER, concurring in part and dissenting in part:

I concur in the majority's affirmance of the defendant's conviction for first degree murder. Unlike the majority, however, I would also uphold the determination that the defendant is eligible for the death penalty, and accordingly I dissent from that portion of the majority opinion.

Although the legislature apparently intended to

omit domestic disputes from the scope of the home invasion statute, no mention was made during the legislative debates of entries made in violation of protective orders or other decrees barring a person's presence in a home. After reviewing the legislative history of the home invasion provision, the appellate court in *People v. Moulton*, 282 Ill. App. 3d 102, 107 (1996), concluded:

> "It is apparent that the legislature did not intend for the home invasion statute to apply to cases of domestic violence involving married couples. It is unclear, however, whether the statute applies in cases where, as here, the parties are recently divorced and the defendant retains an ownership, but not a possessory, interest in the dwelling."

The defendant's entry in *Moulton* was made in violation of an order of protection. Like *Moulton*, the present appeal falls in the latter group of cases, in which the defendant retained an ownership interest, but not a possessory interest, in the subject property.

Unlike the majority, I would conclude that a defendant who violates an order of protection by entering the subject premises has entered the dwelling of another, as prohibited by the home invasion statute. Entry of a residence made in violation of a court order is done without authority and, moreover, can represent as great a risk to the personal safety of the occupants as the unauthorized entry of a stranger's home. I would therefore construe the home invasion statute as including within its scope an entry made in violation of an order of protection. This interpretation is consistent with the purposes of both the home invasion statute and the Illinois Domestic Violence Act of 1986 (750 ILCS 60/101 through 401 (West 1996)).

For these reasons, I believe that the defendant could be found eligible for the death penalty on the ground that the murder occurred in the course of his commission of home invasion. I would therefore consider in this

appeal the remaining challenges raised by the defendant to his sentence of death.