# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Wilson*, 2012 IL App (1st) 092910

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DARRIUS WILSON, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-09-2910 |
| Filed | February 9, 2012 |
| Rehearing denied | March 12, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for aggravated unlawful use of a weapon and unlawful use of a weapon were reversed on the ground that the trial court denied defendant his right to present a defense and cross-examine witnesses when defense counsel was prevented from introducing records resulting from an investigation initiated to determine whether proper police procedures were followed by the police officers involved in defendant's apprehension and prosecution, especially when those records demonstrated bias and a motive to testify falsely on the part of those officers and the exclusion of the evidence was not harmless. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-03618; the Hon. Lawrence Flood, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on
Appeal

Michael J. Pelletier and Alan D. Goldberg, both of State Appellate
Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Peter
Fisher, and Kathleen Warnick, Assistant State's Attorneys, of counsel),
for the People.

Panel

PRESIDING JUSTICE LAVIN delivered the judgment of the court, with
opinion.
Justice Pucinski concurred in the judgment and opinion.
Justice Sterba dissented, with opinion.

# OPINION

¶ 1     Following a jury trial, defendant Darrius Wilson was found guilty of aggravated unlawful use of a weapon (720 ILCS 5/24-1.6(a)(1) (West 2008)) and unlawful use of a weapon (720 ILCS 5/24-1(a)(4) (West 2008)), and not guilty of aggravated assault (720 ILCS 5/12-2(a)(6) (West 2008)). For the charges on which he was convicted, defendant was respectively sentenced to two and three years' imprisonment, to be served concurrently. On appeal, defendant contends that: (1) the trial court denied his right to present a defense and cross-examine witnesses when it prevented defense counsel from introducing Independent Police Review Authority (IPRA) records to demonstrate bias and motive to testify falsely; (2) the trial court violated defendant's right to confront witnesses when it prevented defense counsel from "refreshing a witness' recollection in order to impeach"; and (3) his conviction for aggravated unlawful use of a weapon must be vacated under the one-act, one-crime rule.

¶ 2                                    I. BACKGROUND

¶ 3     At trial, Bennie Parker first testified on behalf of the State. He testified that on January 22, 2008, he was working as a security aide stationed at a metal detector in Wendell Phillips High School in Chicago. Two other security aides and Chicago police officer Anthony Davis were also present. At around 7 a.m. that morning, Parker observed that defendant was wearing a baggy, black coat, gray-hooded sweatshirt, and dark blue jeans. Because defendant set off the metal detector twice, Parker decided to conduct a search and asked defendant to raise his arms. During the search, Parker felt an object in defendant's left hand. Defendant's hands were not visible due to his clothing. Parker testified, "I felt something like a gun. I felt around, felt the hammer." At that moment, Parker grabbed defendant's wrist and brought it down to the ground and yelled "gun" to warn security and the other students. Defendant pulled away from Parker and fled from the school building.

¶ 4    Parker and Officer Davis pursued defendant. Outside of the school, Parker got into his car while Officer Davis chased defendant on foot. Parker picked Officer Davis up during the pursuit and temporarily lost sight of defendant until they saw defendant enter a Green Line El station at 43rd Street and South Indiana Avenue. Officer Davis exited the car and confronted defendant. Parker heard Officer Davis yell, "police" while telling defendant to "drop it and get on the ground" approximately three or four times. Parker then testified he saw defendant "drawing out of his waist a silver object *** facing Officer Davis." Parker described the silver object as a "small silver semi-gun, a small metal gun." Parker saw defendant "to try to point the gun towards Officer Davis." Parker drove away from the station because he "knew that somebody was going to get shot." He heard two or three shots, turned around, and saw defendant facedown with Officer Davis on top of him. Moments later, Parker saw Officers Hosley and Kelly arrive. Officer Hosley retrieved defendant's gun, which was on the ground.[1]

¶ 5    During cross-examination, Parker stated that he had searched defendant on other days prior to the incident in question when "[s]omething real small maybe from his belt or a game boy," had set off the metal detectors. Parker initially thought the object he discovered in defendant's possession on the day of the incident could have been a Sony PlayStation Portable (PSP), a handheld videogame console, which defendant had previously brought to school.

¶ 6    Defense counsel also elicited testimony from Parker that he saw "[d]efendant putting something in his waist" during the chase. Defense counsel then asked Parker if he spoke to an Investigator Delaney on January 22, 2008, but Parker replied, "I spoke with a lot of detectives, so I don't recall this particular detective." A brief sidebar then occurred, with defense counsel requesting to use the IPRA records to refresh Parker's recollection, which the trial court denied.

¶ 7    Lisa Gilbert, a latent print examiner for the Illinois State Police, testified that the gun, bullets, cartridges, and magazine recovered from defendant did not produce any latent prints suitable for a meaningful comparison, while still allowing that the lack of intact latent prints did not necessarily mean the weapon was never handled, since the leaving of a print on any given object is subject to highly variable circumstances.

¶ 8    Officer Anthony Davis testified that he was working off duty as a security guard at Wendell Phillips High School, wearing civilian clothing, with his badge dangling around his neck. At one point, Officer Davis heard a metal detector go off and then saw Parker doing a pat down of defendant. Officer Davis heard Parker yell that defendant had a gun and saw him turn and run out a door. Officer Davis called 911 and pursued defendant for several blocks on foot before getting into Parker's car. The two briefly lost sight of defendant before seeing him walking toward an El train station on 43rd Street.

---

[1]Officer Hosley was subpoenaed but did not testify at trial. It was later revealed he was out of the country for a period of time and did not receive the subpoena. Furthermore, for unspecified reasons, Officer Hosley was stripped of his duties, was not allowed to testify unless "forced to," and was on furlough during the trial dates.

¶ 9    Officer Davis exited Parker's car and entered the train station, where he saw defendant standing by a farecard vending machine. At that time, defendant's back faced Officer Davis, who identified himself as a police officer and told defendant to put his hands up. Defendant turned around and reached for the right side of his waist. From this vantage point, Officer Davis saw a gun in defendant's waist, prompting him to again tell defendant to put his hands up. Defendant then attempted to pull the gun from his waist, causing Officer Davis to fire his gun "for fear of [his] life and the life of others." After the gun shot, defendant attempted to go behind a nearby pillar. Officer Davis repeated his instruction for defendant to stop and put his hands up. Because defendant did not comply and still had his hands on his gun, Officer Davis fired his gun two more times. At that point, defendant fell to the ground and a gun fell to his side, on the ground. Officer Davis approached defendant and secured him. Although Officer Davis testified that an ambulance and other police personnel arrived, he did not see who picked up defendant's gun.

¶ 10    On cross-examination, Officer Davis stated that defendant only "attempted" to pull his gun out of his waistband and that the gun never left the waistband. Defense counsel then elicited testimony from Officer Davis that he was present for an "interview" in November 2008, where Officer Davis was asked, "What did [defendant] do?" During that interview, Officer Davis answered, "He turned and faced me. He tried to go to the station, and I told him again to drop the gun. At that point he reached in his waistband and pulled the gun out."

¶ 11    Sergeant Tony Brown testified next. On January 22, 2008, Sergeant Brown responded to a call at approximately 8:25 a.m. at an El train station on 43rd Street. Upon arriving, he saw Officer Hosley, who informed Sergeant Brown that he had recovered a gun. In order to secure it, the two went into Brown's police car, where Brown "cleared" the gun, by removing the magazine and unchambering a round.

¶ 12    During cross-examination, Brown stated that, generally, gloves and a weapon recovery kit should be used if a gun is found at a crime scene. He conceded that a weapon recovery kit was not used in this instance and that he handled the gun without gloves. On redirect examination, Sergeant Brown stated that when a loaded gun is still within reach of a suspect or in the vicinity of civilians, a weapon recovery kit is not required to be used in securing the gun, because of the intrinsic safety considerations.

¶ 13    Fred Heidemann was the evidence technician on the day of the incident. He described the manner in which the evidence was collected from the crime scene, including receiving defendant's gun, magazine and bullets from Officer Hosley and inventorying them. He stated that he did not see a PSP at any time while collecting and inventorying evidence. The State then rested its case.

¶ 14    Maxine Clark, defendant's mother, was the first witness to testify on behalf of defendant. She stated defendant owned a PSP which he took out of the house everyday, including the morning of January 22, 2008. She acknowledged, however, that she was not with defendant when he was at the school or at the train station.

¶ 15    Tyrone Porter testified that on the morning of the incident, he was outside a store across the street from the 43rd Street El station. He heard "hollering" across the street which caught his attention. He testified that someone was saying, "Get down, get on the wall, get on the

-4-

wall," and a contemporaneous gunshot. Prior to the gunshot, Porter did not see defendant reach for anything in his waistband. After the first shot, defendant did not fall but began turning to a wall. Porter stated that the yelling continued and, after hearing another shot, he saw defendant fall to the ground. Porter did not see anything on the ground next to defendant. After the shooting, Porter saw the shooter get into a car with another individual. The two left for 10 to 15 minutes before returning. Porter stated that the shooting officer "smirked" after coming back.

¶ 16    On cross-examination, Porter acknowledged that he was across the street while witnessing the incident. He also denied he heard the shooter say "drop it." The State then presented a written statement given to Sergio Seritello, a private investigator, by Porter which indicated that he heard the shooter say, "Drop it, drop it." Porter, however, denied making this statement. When confronted with the written statement itself, Porter confirmed his signature on the statement but continued to deny that he stated he heard the shooter say "drop it" at any time. It was later stipulated that Seritello would testify that Porter stated to him that a man in front of the 43rd Street station shouted, "Drop it, drop it," during the incident.

¶ 17    Frederick Stinson testified that on the day of the shooting, he was employed by the Chicago Transit Authority at the 43rd Street station. While Stinson was walking toward a booth, he saw a young man walk into the station. Shortly after entering a booth near the entrance of the station, he saw another man run into the station with a gun. Stinson dropped to the floor and heard him say, "[P]ut your hands up, put your hands up." Stinson made an emergency transmission on his radio and then heard gunshots. Stinson remained in the booth for several minutes before exiting and talking to some people. At some point afterward, he saw a young man on the ground but did not see anything around him.

¶ 18    After the defense rested its case, Eric Osborne was called as a rebuttal witness by the State. Osborne testified that he was a paramedic that responded to the shooting of defendant on January 22, 2008. Defendant's clothing was cut off and removed during the course of treatment, and Osborne stated that no PSP was present.

¶ 19    The jury found defendant not guilty of aggravated assault, but found him guilty of unlawful use of a weapon (firearm on school grounds) and aggravated unlawful use of a weapon (uncased, loaded, and accessible firearm). Defendant now timely appeals.

¶ 20                                    II. ANALYSIS
¶ 21                              A. IPRA Investigations
¶ 22    Defendant first contends that the trial court denied his right to present a defense and to examine witnesses when it precluded him from utilizing IPRA records on cross-examination to demonstrate State witnesses' bias and motive to testify falsely. Prior to trial, defendant presented a motion *in limine* to admit evidence of IPRA investigations involving Officer Hosley, Sergeant Brown, and Officer Davis, which were initiated to determine whether proper police procedure was followed. Officer Davis's investigation involved the shooting of defendant and the investigations involving Officer Hosley and Sergeant Brown related to the handling of the gun at the crime scene. Defendant's motion was ultimately denied.

¶ 23    As a threshold matter, we note that the parties dispute the applicable standard of review. Defendant asserts that this court must review his contention under a *de novo* standard of review, whereas the State asserts we must view the trial court's decision under an abuse of discretion standard. Defendant argues that the trial court "completely denied [defendant] the opportunity to cross-examine on witness interest or bias," and thus *de novo* review applies. See *People v. Nutall*, 312 Ill. App. 3d 620, 627 (2000) (stating that "the right of cross-examination is not subject to the court's discretion"). We disagree. After reviewing the discussion during the hearing on the motion *in limine* and resulting proceedings, we find nothing to indicate that the trial court denied defendant the opportunity to cross-examine for bias. In fact, the trial court acknowledged during a hearing on the motion that bias and interest to testify falsely are "always relevant, but the question is the evidence that you want to introduce to establish that bias or interest or prejudice, whether or not that's really relevant to that particular issue." Furthermore, the trial court explicitly stated it was denying the "motion to admit the evidence regarding the IPRA investigations," but stated that it could be used for impeachment and that trial testimony could possibly open the door to the evidence.

¶ 24    In our view, the trial court simply denied defendant's motion *in limine*, thereby limiting the scope of whatever cross-examination defendant wished to offer. Defendant was still afforded the opportunity to cross-examine witnesses on any relevant matters, including interest or bias, albeit without the IPRA records. As a general matter, "a decision on an evidentiary motion, such as a motion *in limine*, is committed to the trial court's discretion." *People v. Nelson*, 235 Ill. 2d 386, 420 (2009). Furthermore, it is well established that while a trial court may not deprive a defendant of the right to question witnesses, it may limit the scope of cross-examination under its discretionary powers. *People v. Stokes*, 392 Ill. App. 3d 335, 340 (2009). Accordingly, we will not reverse the trial court's determinations here absent an abuse of discretion. *Nelson*, 235 Ill. 2d at 420.

¶ 25    As stated, defendant filed a motion to admit evidence from IPRA investigations related to the instant case regarding the handling of the gun and the shooting of defendant, in order to support his theory that he was unarmed and that the weapon was planted by police. Defendant also subpoenaed documents related to the investigations, which the court reviewed *in camera*. After reviewing the documents, the trial court heard arguments by both parties regarding the motion on June 1, 2009. Defense counsel argued that the IPRA proceedings were relevant to motive, bias and interest to testify falsely. It was further argued that despite the fact the IPRA investigations were still ongoing, because the officers involved were "under the microscope," the investigations could nevertheless color their testimony. The State argued that there was no relevance because of the pending nature of the investigation, also asserting that such investigations are routinely initiated in a case involving a police shooting. The trial court generally agreed with the State's observations and denied defendant's motion, although it stated that statements given by a witness during an IPRA investigation could be used for impeachment. After Parker's testimony, defense counsel indicated that it received a message that the allegations against Sergeant Brown had been "sustained" regarding the handling of the gun. The trial court did not alter its ruling, stating that there was still no detail as to what was actually "sustained," and that the finding could

be based on some technical rule application or other internal procedure that was not followed.

¶ 26    Defendant argues on appeal that the trial court erred in preventing defense counsel from utilizing the IPRA records related to the shooting to show Officer Davis's and Sergeant Brown's motive, bias and interest to testify falsely. We agree. Part of a defendant's fundamental, constitutional right to confront witnesses against him includes a right to inquire into a witness's bias, interest, or motive to testify falsely. *People v. Nelson*, 235 Ill. 2d 386, 420 (2009). The widest latitude should be given the defense on cross-examination when trying to establish a witness's bias or motive. *People v. Wilkerson*, 87 Ill. 2d 151, 156 (1981). The evidence used in this manner must give rise to the inference that the witness has something to lose or gain by testifying. *People v. Buckner*, 376 Ill. App. 3d 251, 255 (2007). Accordingly, the evidence must not be remote or uncertain. *Nelson*, 235 Ill. 2d at 421.

¶ 27    The parties properly direct this court's attention to two cases in support of their arguments. The State seeks legal refuge in *People v. Williams*, 267 Ill. App. 3d 82 (1994), in which a defendant was involved in a traffic stop that culminated in her being charged with battery and resisting arrest. At trial, the defendant wished to present evidence of one officer's training and disciplinary record. She argued that the involved officer exhibited "odd behavior" before and during the traffic stop which may have "reflected a serious discipline problem," and thus he may have been motivated to testify falsely regarding the stop to avoid another disciplinary incident. *Id.* at 86-87. The trial court rejected this argument and denied defendant's request. The Second District affirmed, finding that the officer's veracity regarding the procedures followed pursuant to a traffic stop was irrelevant to defendant's actions after the stop, *i.e.*, battery and resisting arrest. *Id.* at 87-88.

¶ 28    Defendant, on the other hand, points to *People v. Averhart*, 311 Ill. App. 3d 492 (1999), where a defendant was arrested by a police officer for possession of a controlled substance. Almost a year prior to that arrest, however, the defendant was arrested by the same police officer in an unrelated matter where a scuffle ensued, causing both him and the officer to become injured. Defendant had filed a complaint with the Office of Professional Standards (OPS), the IPRA's predecessor, alleging physical abuse, verbal abuse, and false arrest. The complaint against the officer was "not sustained," and defendant was ultimately found not guilty of the underlying possession charge. At defendant's second trial, defendant wished to introduce evidence of the prior OPS complaint to show possible bias or motive that might color the officer's testimony. The trial court, however, precluded the defendant from cross-examining the officer regarding the specifics of the OPS complaint.

¶ 29    This court reversed the trial court's determination. After observing that the trial's outcome turned almost entirely on credibility determinations, this court held that the OPS complaint from a prior arrest was very relevant in showing bias or motive in the officer's testimony. *Id.* at 499. Furthermore, because part of the defendant's theory at trial was that the officer had planted evidence to effect an arrest, it was noted that evidence showing motive to testify falsely could not be called collateral and the defendant had a right to develop his theory. *Id.* at 501.

¶ 30    We first observe that *Williams* is readily distinguishable from the instant case. That

officer's disciplinary record had no factual relevancy to the incident the defendant was involved in, thus making the evidence remote and collateral. We also agree with the observation that whether the officer followed procedure in effectuating the traffic stop has little relevance as to whether defendant ultimately committed a battery and resisted arrest. The State, however, argues that the instant case is similar to *Williams* because the handling of the gun was merely collateral to defendant's guilt. We disagree. Essential to defendant's theory of the case was that the gun was purposely planted and then mishandled in an effort to justify police conduct. Accordingly, evidence and testimony relating to whether the gun was planted or in defendant's possession cannot be said to be merely collateral.

¶ 31    Contrarily, the circumstances of the instant case bear a close resemblance to *Averhart*. Both this case and *Averhart* involve allegations that evidence was possibly planted by officers that served as key State witnesses. Both cases lack significant physical evidence, with the respective outcomes relying heavily on credibility determinations by a jury. We also note that the IPRA investigations here, like the OPS investigation in *Averhart*, involved both the testifying officers and defendant at trial. Perhaps the only meaningful difference is that in *Averhart*, the OPS complaint related to a prior incident as opposed to the one at trial.

¶ 32    Furthermore, in applying the legal principles stated above, we also conclude that the IPRA investigations give rise to the requisite inference that the witness has something to lose or gain by testifying. See *Buckner*, 376 Ill. App. 3d at 255. The IPRA investigations involved the same incident at trial, with the outcomes relying heavily on the testifying officers' portrayal of events. For obvious reasons, if an officer subjected to an IPRA investigation provides a statement to an investigator, that same officer could be motivated to testify consistently at a trial regarding the same incident to maintain his or her credibility. Here, the defense theory was essentially that a police officer shot an unarmed defendant, planted a gun near him and then mishandled the gun to justify the lack of defendant's fingerprints. The IPRA investigations concerning Officer Davis and Sergeant Brown, respectively, related to the shooting of defendant and the mishandling of the gun. In that sense, the evidence here is more compelling than the OPS investigation in *Averhart* because these investigations related directly to the incident at trial. For the reasons stated above, we find that the evidence is not remote or uncertain, and is hardly collateral to defendant's theory of the case. See *Averhart*, 311 Ill. App. 3d at 502.

¶ 33    The State has suggested that it would be improper to admit the evidence because the investigations were ongoing at the time and that it is "natural" for such investigations to be opened in police shooting cases. We disagree. We note that despite a "not sustained" finding in the OPS investigation in *Averhart*, this court nevertheless considered the investigation relevant to bias and motive. *Averhart*, 311 Ill. App. 3d at 504-05. We would find similarly here, because evidence of the IPRA investigations was not being offered for its truth; rather, it was being offered to show a witness's potential motivation to testify falsely. Furthermore, we believe a witness would likely be motivated to testify consistently regardless of the outcome of the IPRA investigation. Next, although these investigations might be a "natural" occurrence, such an argument is more appropriate in determining the probative weight of the evidence, and not its relevancy or admissibility. Accordingly, given defendant's theory of the case, as well as the close relation between the IPRA investigations, the witnesses at trial, and

the incident that precipitated the trial, we would find that it was an abuse of discretion for the trial court to preclude defense counsel from introducing the IPRA investigations to show possible bias or motive to testify falsely.

¶ 34 The State argues that even if an error occurred, any error was harmless. Our supreme court has held the burden is on the State to establish beyond a reasonable doubt that infringement of a defendant's constitutional right of confrontation did not contribute to the outcome of the case. *People v. Lofton*, 194 Ill. 2d 40, 61 (2000). The State, however, simply argues that the jury was made sufficiently aware of the IPRA investigations through cross-examination. We disagree. Defendant was only allowed to use isolated statements given during the course of the IPRA investigations for the purposes of impeachment. Defense counsel, however, was precluded from explaining the context of these statements, that is, that they were given pursuant to an independent and separate internal investigation on the propriety of the testifying witness's conduct. Again, this is similar to *Averhart*, where this court found it insufficient that the jury was aware of an OPS investigation but was not made aware of the factual underpinnings of it.

¶ 35 Furthermore, we reiterate that there is a distinct lack of any physical evidence in this case. Officer Davis was the only individual to witness the gun fall from defendant after the shooting. Although Parker also connected defendant to a gun, his ability to observe was limited as his conclusions were based on feeling an object under defendant's clothing and events he saw while driving a vehicle during a chase. The jury also did not appear to totally accept Parker's testimony. Although Parker stated he saw defendant pulling out a gun from his waistband in the train station, mere feet from Officer Davis, defendant was nevertheless found not guilty of aggravated assault. Added to this, another witness testified that he never saw a gun at the scene and the gun lacked any identifiable prints. Finally, we find it would be circular to conclude that evidence here was overwhelming where the evidence is based on witness credibility, which the error directly affects. Accordingly, we find that the error was not harmless and we reverse on this issue.

¶ 36                           B. Officer Davis–Excessive Force Complaint

¶ 37 Defendant also appears to advance a related claim that the trial court improperly excluded evidence of a prior excessive force claim against Officer Davis mentioned in an OPS report. As an initial matter, we note that the State has correctly argued that defendant has forfeited this issue by failing to: (1) object to the judgment and sentence on both counts; and (2) raise the instant issue in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Defendant, however, also correctly concedes that this issue may be reviewed under the plain error doctrine. See *People v. Harvey*, 211 Ill. 2d 368, 389 (2004). Under the plain error doctrine, we will review unpreserved error when either: (1) the evidence is closely balanced, regardless of the seriousness of the error; or (2) the error is serious, regardless of the closeness of the evidence. *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005). The first step of plain error analysis, however, is deciding whether any error has occurred. *People v. Walker*, 232 Ill. 2d 113, 124-25 (2009). If an error is deemed to have occurred, only then do we turn to the prongs of the plain error analysis.

¶ 38    Unlike the IPRA investigations discussed above, we do not see the relevancy of this OPS complaint. As stated above, evidence offered to show bias and motive must not be remote or uncertain. *Nelson*, 235 Ill. 2d at 421. The report, however, indicates that the complainant in the OPS investigation was not defendant, does not relate to the incident in the instant case's trial in any way, concerns a claim (excessive force) dissimilar from the one at hand, and was concluded well over a year prior to defendant's trial. Furthermore, given the lack of any relation to the case *sub judice*, we find nothing to create an inference that Officer Davis may have something to gain or lose in relation to the excessive force complaint by testifying here. Finally, the only reference to this OPS complaint in the record is when the State asked during a hearing on a motion *in limine* if defense counsel was seeking to introduce it. No response was given. Defendant's motion *in limine* to introduce the above-discussed IPRA investigations did not mention the OPS complaint. Accordingly, it appears that the trial court did not even rule on this issue. For these reasons, we find that no error occurred here. Unless defendant is somehow able to establish the relevancy of the OPS report on retrial, we find that it would remain inadmissible to show bias or motive on the part of Officer Davis.

¶ 39              C. Parker–Refreshing Recollection and Impeachment

¶ 40    Although we have reversed on the first issue, we are inclined to address defendant's next contention, as it may arise on retrial. Defendant next contends that defense counsel was improperly precluded from "refreshing [Parker's] recollection in order to impeach" him. During Parker's cross-examination, he was asked by defense counsel if he saw defendant "remove anything from his sleeve and put it in his waist." Parker responded, "I saw him moving around when he was running, I seen the Defendant putting something in his waist, yes." Defense counsel then asked Parker whether he had told Investigator Delaney (who was involved in the IPRA investigations) this factual detail. Parker stated he did not recall. A sidebar was then held, where the following took place:

> "MS. SCHOR: Your Honor, we knew this was going to come up about Investigator Delaney–I left out the word independent police review according to your ruling (inaudible).
>
> THE COURT: Okay.
>
> MS. SCHOR: However, the investigator, I can't call the defendant–I can't call him, Delaney. But he's not understanding who I'm speaking of. I would like to refresh his recollection about going through the independent police review authority and talking–
>
> MS. PARA [Assistant State's Attorney]: It is not impeaching because he's not testified that [*sic*]. He did not speak to him, his testimony is that he spoke with a lot of people that day and he did not remember all of their names.
>
> &ast; &ast; &ast;
>
> THE COURT: It's not a prior inconsistent statement.
>
> MS. SCHOR: Your Honor–
>
> THE COURT: It's improper refreshing your recollection also. Okay.
>
> MS. SCHOR: So I cannot?

THE COURT: He said he doesn't know. Okay.

MS. SCHOR: So I can't refresh his recollection?

THE COURT: No. Because you can't refresh his recollection."

¶ 41 After the sidebar, defense counsel then asked, "Did you tell a Richard Delaney in Area Two at 12:00 on January 22nd *** that you saw [defendant] remove something from his wrist and make a movement towards his waist?" Parker responded, "I don't recall, Ma'am, because we were in the police station all day from that time of the incident happened until, what, 5:00 or 6:00 that evening." Defense counsel then asked if anything would refresh Parker's recollection regarding what he told Delaney but the trial court sustained the State's subsequent objection to the question.

¶ 42 Here, it appears that two distinct evidentiary concepts were being intertwined at trial: impeachment and refreshing a recollection. After a review of the relevant IPRA statement, we can conclude that defense counsel sought to impeach Parker by omission by attempting to show that he had omitted a factual detail during an earlier interview with an investigator. Impeachment by omission of facts may be used where a witness had the opportunity to make a statement about the omitted facts and, under the circumstances, a reasonable person ordinarily would have included the facts. *People v. McWhite*, 399 Ill. App. 3d 637, 643 (2010). Parker, however, was unable to recall if he had even spoken to Delaney. Accordingly, to impeach Parker, defense counsel was first required to refresh Parker's recollection on this matter. The relevant question before us is whether the trial court abused its discretion in regard to defense counsel's manner and mode of attempting to refresh Parker's recollection. See *People v. Connolly*, 322 Ill. App. 3d 905, 921 (2001).

¶ 43 We find no abuse of discretion here. Although it is unclear why the trial court stated, "Because you can't refresh his recollection," it nevertheless appears that the trial court was not satisfied with the manner in which defense counsel was attempting to lay a foundation for refreshing Parker's recollection or impeachment. Defense counsel asked Parker if he had made a particular statement to Delaney on a particular date, with Parker responding that he did not recall. In *People v. Shatner*, 174 Ill. 2d 133 (1996), our supreme court held that a witness's inability to "recall making one particular statement to a police detective" is, by itself, "not sufficient to fulfill the foundational requirement that the witness's memory had been exhausted." *Shatner*, 174 Ill. 2d at 153-54. Defense counsel here only established that Parker did not recall making a statement to Delaney and asked no other questions on the matter to explore whether Parker's memory had been exhausted. The trial court, consistent with *Shatner*, found this to be insufficient. Furthermore, even if this court believes that another trial court may have decided differently under the circumstances, we will not substitute our judgment for a trial court's discretionary decision unless the decision is "arbitrary, fanciful, unreasonable, or when no reasonable person would adopt the trial court's view." *People v. Ward*, 2011 IL 108690, ¶ 21. We do not find that the trial court's holding resembles such a decision.

¶ 44 We note that defendant also argues that the trial court's ruling was "curious" because defense counsel was later permitted to refresh Officer Davis's and Sergeant Brown's recollection with IPRA records. In both instances, however, the witness being cross-

-11-

examined stated that he remembered the specific interview but did not recall a particular detail, and that a transcript of the interview would refresh his recollection. A similar exchange did not occur during Parker's cross-examination and thus we find no inconsistency in the trial court's discretion. In sum, while we find that the IPRA records could have been used to refresh Parker's recollection or impeach him (as they were used with Officer Davis and Sergeant Brown), they can only be used in such a way after a proper foundation is laid.

¶ 45                                    D. Double Jeopardy

¶ 46    Because we reverse on the grounds stated above, we are now bound to consider the double jeopardy implications of our finding that the denial of defendant's right to present the IPRA record on cross-examination warrants reversal. The double jeopardy clause prohibits retrial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to present in the first proceeding. *Burks v. United States*, 437 U.S. 1, 11 (1978). It does not, however, preclude retrial where a conviction has been set aside because of an error in the proceedings leading to the conviction. *People v. Mink*, 141 Ill. 2d 163, 173-74 (1990). Furthermore, "retrial is permitted even though evidence is insufficient to sustain a verdict once erroneously admitted evidence has been discounted, and for the purposes of double jeopardy all evidence submitted at the original trial may be considered when determining the sufficiency of the evidence." *People v. Olivera*, 164 Ill. 2d 382, 393 (1995) (citing *Lockhart v. Nelson*, 488 U.S. 33 (1988)).

¶ 47    When reviewing the sufficiency of the evidence, the appropriate standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense were proven beyond a reasonable doubt. *People v. Pollock*, 202 Ill. 2d 189, 217 (2002) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). After viewing the relevant evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found defendant guilty of the charges. However, this determination is not binding on retrial and is not intended to express an opinion concerning defendant's guilt or innocence. Accordingly, we find no double jeopardy impediment to retrial.

¶ 48                                    III. CONCLUSION

¶ 49    Because we have reversed on the first issue, we find that defendant's alternative contention that his aggravated unlawful use of a weapon conviction must be vacated under the one-act, one-crime doctrine is moot. For the foregoing reasons we reverse the judgment of the trial court of Cook County and remand for further proceedings.

¶ 50    Reversed and remanded.

¶ 51    JUSTICE STERBA, dissenting:

¶ 52    I cannot join in today's decision because, while I agree with the majority that the trial court erred in precluding defense counsel from introducing evidence of the IPRA

investigations to show possible witness bias or motive to testify falsely, I believe the error was harmless. Accordingly, I would affirm the judgment of the trial court.

¶ 53       As an initial matter, I disagree with the majority's conclusion that because the trial court's ruling did not deny defendant the opportunity to cross-examine the witness for bias, but merely limited the scope of such examination, the ruling is subject to an abuse of discretion standard of review. As the majority acknowledges, a defendant has a constitutional right to inquire into bias, interest, or any potential motive of a witness to testify falsely. The exposure of a witness's motive in testifying is an important component of the constitutionally protected right of cross-examination. *Delaware v. Van Arsdall*, 475 U.S. 673, 678-79 (1986). Moreover, I agree with the majority that evidence related to the IPRA investigations was relevant to defendant's theory of the case, namely, that the gun was purposely planted and then mishandled in an effort to justify police conduct. The majority also correctly points out that defendant was not completely denied the opportunity to cross-examine on witness interest or motive to testify falsely.

¶ 54       However, as this court noted in *Averhart*, the discretionary authority of the trial court to limit the scope of cross-examination does not come into play unless the court has first permitted sufficient cross-examination to satisfy the confrontation clause. *Averhart*, 311 Ill. App. 3d at 497. The test to determine constitutional sufficiency is whether the "limitation on cross-examination created a substantial danger of prejudice by denying defendant his right to test the truth of the testimony." *Id*. In order to preserve a defendant's constitutional right to confront the witnesses against him, a trial court should consider whether barring the evidence would result, for all practical purposes, in an evisceration of the defendant's theory of the case. *Id*. When making the initial determination of whether a confrontation clause violation has occurred, the focus is on the individual witness, not on the outcome of the entire trial. *Van Arsdall*, 475 U.S. at 680.

¶ 55       The decision of the trial court to bar evidence of the IPRA investigations hindered defendant's ability to demonstrate interest or motive on the part of a witness to testify falsely and had the potential to eviscerate his theory of the case. Moreover, between the time of the ruling on the motion *in limine* and the trial, IPRA charges against Sergeant Brown for mishandling the weapon were sustained, providing additional support for defendant's theory of witness motive to testify falsely in order to avoid potential disciplinary action. The circuit court revisited this issue and upheld its earlier ruling barring any details of the IPRA investigations, thereby depriving defendant of his only avenue for presenting this specific type of impeachment evidence. The jury never heard testimony about what an IPRA investigation is, or that both Officer Davis and Sergeant Brown gave statements because they were the subjects of the investigations and not merely being interviewed as witnesses. The jury also never heard testimony regarding the potential consequences to either officer as a result of the investigations. Where a defendant shows that he is prohibited from engaging in otherwise appropriate cross-examination designed to show a witness's motive in testifying, he has stated a confrontation clause violation. See *Van Arsdall*, 475 U.S. at 680. Thus, in my view, the trial court's decision to bar evidence of the actual IPRA investigations constituted a violation of the confrontation clause and is therefore subject to a harmless error analysis. See *People v. Patterson*, 217 Ill. 2d 407, 427-28 (2005). It is axiomatic that a criminal

defendant is constitutionally entitled to a fair trial, not a perfect one. *Van Arsdall*, 475 U.S. at 681. Thus, not all constitutional errors require reversal of a judgment of conviction. *Id.*

¶ 56    The test we apply in a harmless error analysis is whether the State has met its burden of establishing beyond a reasonable doubt that the constitutional error did not contribute to the verdict obtained. *Patterson*, 217 Ill. 2d at 428. There are three different approaches to measuring harmless error: "(1) focusing on the error to determine whether it might have contributed to the conviction, (2) examining the other evidence in the case to see if overwhelming evidence supports the conviction, and (3) determining whether the improperly admitted [or excluded] evidence is merely cumulative or duplicates properly admitted evidence." *Id.* The Supreme Court has noted that factors to consider in determining whether an error is harmless include: (1) the importance of the witness's testimony in the prosecution's case, (2) whether the testimony was cumulative, (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, (4) the extent of cross-examination otherwise permitted, and (5) the overall strength of the prosecution's case. *Van Arsdall*, 475 U.S. at 684.

¶ 57    The majority concludes that the error was not harmless because, *inter alia*, the jury did not appear to completely accept Parker's testimony. The majority goes on to explain that although "Parker stated he saw defendant pulling out a gun from his waistband in the train station, mere feet from Officer Davis," the jury nevertheless found him not guilty of aggravated assault. *Supra* ¶ 35. While Parker did in fact testify that he saw defendant reach his hand toward his waist and come out with a gun, when asked if he saw defendant bring out the weapon, Parker replied, "Not all the way." Parker said that he saw defendant bring the gun halfway out. This testimony, in the minds of the jury, may not have supported the aggravated assault charge as the gun was never pointed at Officer Davis or in his direction and, therefore, does not necessarily support the majority's conclusion that the jury did not accept Parker's testimony when it found defendant not guilty of aggravated assault.

¶ 58    The majority also concludes that the only meaningful difference between the case *sub judice* and *Averhart* is that in *Averhart*, the police investigation involved a prior incident as opposed to the one at trial. *Supra* ¶ 31. I disagree. In my view, the most important distinction between the investigations at issue in both cases is that in *Averhart*, the investigation involved a prior incident between the defendant and the key prosecution witness, the officer, and therefore was directly relevant to defendant's theory that the officer had a grudge against him and a reason to frame him. *Averhart*, 311 Ill. App. 3d at 498. Moreover, importantly, the investigation in *Averhart* was initiated because the defendant in that case filed a complaint against the officer, and the defendant contended that the officer subsequently threatened to arrest him every time he saw him in order to get back at him for filing the complaint. *Id.* Furthermore, in *Averhart,* the officer suffered an injury during a struggle with the defendant during the prior incident at issue; and the defendant was ultimately acquitted of the earlier charged offense, which allegedly resulted in an escalation of the officer's hostility toward the defendant. *Id.* Here, defendant merely wanted to use the fact that IPRA conducted routine investigations into the incident to show that the officers, with whom he had no prior history, had motive to frame him and testify falsely to cover up their alleged wrongdoing.

¶ 59    I believe that the State met its burden of establishing that the error did not contribute to

-14-

the jury's verdict. Defendant was able to establish that IPRA conducted investigations into the incident. He was further allowed to question Officer Davis and Sergeant Brown about statements they gave to IPRA investigators. Sergeant Brown was also questioned about his handling of the gun. He acknowledged on cross-examination that he had not followed the proper procedures when he examined and unloaded the gun without wearing gloves. Therefore, defendant was able to introduce evidence to support his theory of the case that the gun was mishandled intentionally as part of the attempt to frame him.

¶ 60    Moreover, in my view, the evidence against defendant was overwhelming. Parker testified unequivocally that he was familiar with guns and that when he searched defendant, he felt the hammer of a gun. Parker shouted, "gun," and defendant broke away from him and ran, evidencing his consciousness of guilt. Parker further unequivocally stated that he then observed defendant pull a gun halfway out of his waistband when Officer Davis confronted him at the El station. Parker was a security guard and not a police officer, and thus not subject to potential disciplinary action as a result of the IPRA investigations, so the exclusion of evidence relating to those investigations had no bearing on Parker's credibility.

¶ 61    Porter, a civilian bystander, testified that he did not see defendant reach for anything and that he did not see anything next to defendant on the ground after the shots were fired. However, he also testified that he was across the street from the station, and his testimony did not establish the distance between his vantage point and defendant, or his angle of vision. Thus, Porter's testimony that he did not see a gun or see defendant reaching for anything is not definitive evidence that defendant did not have a gun. In contrast, the testimony of Parker, who was in a position to see what was happening, carries much more weight. Porter was also impeached with a statement he gave to a private investigator in which he stated that he heard the officer say, "Drop it!" before the shots were fired, even though he testified at trial that he did not hear those words. Finally, the paramedic who responded to the shooting testified that defendant's clothing was removed and no PSP was recovered. Thus, the evidence supporting defendant's convictions was overwhelming and the error in precluding specific evidence related to the IPRA investigations was harmless. Because I would therefore affirm the judgment of the circuit court, I respectfully dissent.