2025 IL App (5th) 240603-U

NO. 5-24-0603

NOTICE
Decision filed 08/26/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 18-CF-1511 |
| | ) | |
| VINCENT GORDON, | ) | Honorable |
| | ) | Richard L. Tognarelli, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BARBERIS delivered the judgment of the court.
Justices Boie and Vaughan concurred in the judgment.

**ORDER**

¶ 1     *Held*:   We grant appellate counsel leave to withdraw and affirm the trial court's judgment where there is no arguable merit to this direct appeal.

¶ 2     Following a jury trial in the circuit court of Madison County, defendant, Vincent Gordon, was found guilty of first degree murder, unlawful possession of a weapon by a felon, and escape. He was sentenced to prison terms of natural life, seven years, and five years for the respective convictions, all to be served consecutively. He appeals from the court's denial of his motion to reconsider sentence. Defendant's appointed counsel on appeal, the Office of the State Appellate Defender (OSAD), has concluded that this appeal lacks substantial merit. On that basis, OSAD has filed a motion to withdraw as counsel pursuant to *Anders v. California*, 386 U.S. 738 (1967), along with a memorandum of law in support of that motion.

1

¶ 3 OSAD served defendant with notice, and this court gave defendant an opportunity to respond, but defendant has not filed any type of response. This court has examined OSAD's *Anders* motion and the accompanying memorandum of law, as well as the entire record on appeal, and has concluded that this appeal lacks merit. Accordingly, we grant OSAD leave to withdraw as counsel and affirm the judgment of the circuit court.

¶ 4                                            BACKGROUND

¶ 5 On June 7, 2018, defendant was charged by superseding indictment with four counts of first degree murder, one count of unlawful possession of a weapon by a felon, and one count of escape. The charges stemmed from the shootings of Derrick Vaughn and Elijah Ingram, resulting in their deaths. Defendant was also alleged to have been in possession of a firearm after a 2015 conviction for unlawful possession of a firearm by a felon, and to have unlawfully removed his electronic ankle monitor while on parole.

¶ 6                                       A. Waiver of Counsel

¶ 7 Prior to trial, defendant requested to proceed *pro se*. At a subsequent hearing, the trial court reviewed the charges against him, as well as the possible range of penalties. The court asked if defendant understood the penalties he was facing but failed to ask whether defendant understood the nature of the charges. Defendant confirmed that he understood the potential penalties, and stated, "I ain't guilty of these charges." The court also reviewed defendant's criminal history and lengthy experience with the criminal justice system, including a case in which he proceeded *pro se* and pled guilty to felon in possession of a firearm in 2017.

¶ 8 The trial court informed defendant at length of the various risks and responsibilities of self-representation and explained that defendant had the right to an attorney. The court then asked

defendant whether he understood, and defendant answered in the affirmative to each point. The court accepted defendant's waiver of counsel and granted his request to proceed *pro se*.

¶ 9                                                    B. Trial

¶ 10    Defendant's jury trial began on October 15, 2018. Alton police officer William Reed testified that on May 21, 2018, he responded to a 911 call from an apartment building located on Lawn Street in Alton. When he arrived, Derrick Vaughn was deceased, and someone else was tending to Elijah Ingram. Terrion Williams gave Officer Reed a description of the assailant. Williams described the assailant as a black male with a darker skin tone, approximately six feet in height, wearing a plaid shirt, with short dreads and a gold front tooth. Williams advised that the shooter bragged about removing his ankle monitor before arriving at the residence. State surveillance footage exhibits showed that defendant was a dark-skinned black male with short dreadlocks.

¶ 11    Williams testified that he was Elijah Ingram's cousin. On the evening of May 21, 2018, Williams was playing cards with Ingram and Vaughn at the home of Terrea Gates. Vaughn had left to buy alcohol, and he returned accompanied by the shooter at approximately 9:50 p.m. Williams testified that Vaughn said he had met the man in jail or prison and introduced him as "Booday." Williams described Booday as having braids, wearing a plaid button-down shirt, and having a scar near his right eye. Williams saw that the shooter was wearing an ankle monitor.

¶ 12    Williams identified defendant in court as the shooter. According to Williams, defendant and Ingram started arguing, and at some point, defendant pulled out a pistol and shot Ingram a few times. When Vaughn attempted to intervene, defendant shot him in the face. Before running out of bullets, defendant also shot at Williams twice but missed. Defendant drove away in his car, which Williams identified as a silver Malibu.

3

¶ 13     Williams testified that neither he nor the victims had a gun. Police swabbed Williams's hand to test for gunshot residue. A forensic scientist with the Illinois State Police (ISP) testified that there was no gunshot residue on Williams when police tested him. However, gunshot residue could have been rubbed or washed off in the time between the shooting and testing. On cross-examination, Williams clarified that defendant must have trailed Ingram's car in his own vehicle when the two arrived together at Gates's apartment, and that he saw defendant leave in the silver car after the shooting. Williams had been drinking but was not under the influence. He claimed to have heard 11 or 12 shots.

¶ 14     Terrea Gates testified that she was at her apartment on the night of May 21, 2018, with Ingram, Vaughn, and Williams, as well as her young children, two younger sisters, and two of her friends. She identified defendant in court and said that he joined the other men in their card game that night. She heard a loud discussion, and asked them to quiet down. She testified that she later heard three or more gunshots and called 911 shortly thereafter. She did not see Williams, Ingram, or Vaughn with a gun that night. She recalled that defendant was wearing a red shirt, jeans, and a do-rag with small braids. She also recalled that defendant had marks over his eyes.

¶ 15     Assistant medical examiner Dr. Gershom Norfleet performed autopsies on Vaughn and Ingram. He determined that both died from gunshot wounds, and that both were homicides.

¶ 16     Police identified a Chevy Impala linked to the crime. The vehicle was registered to Beverly White, but police found defendant's identification card in the car. Police also found a receipt from the River's Edge gas station in West Alton time-stamped 9:07 p.m. in the car. A finance manager at the auto dealership that sold the Impala to White testified that a GPS device was placed on the vehicle and that he provided the tracking information to police. The data showed that on the date

of the incident, the vehicle was at or near the apartment building on Lawn Street from 9:41 p.m. to 10:20 p.m.

¶ 17    The State played surveillance camera footage from the apartment complex and a nearby building. The videos showed a silver Impala trailing behind a white SUV towards the apartment complex. The Impala had a black male driver and sped off from the apartment complex around 10:22 p.m. The Impala's license plate was visible in the footage, and police were able to identify that this was White's car. The State also introduced surveillance footage from the River's Edge gas station, which showed defendant, wearing a plaid shirt, exiting the vehicle and pumping gas. The State contended that defendant was wearing the same type of clothing as the driver of the vehicle from the apartment surveillance footage, and matched Williams's description of the shooter.

¶ 18    Police detective Andrew Pierson testified that he conducted a forensic extraction of the contents of a cell phone that belonged to defendant. The data showed that the phone received an unanswered call from Vaughn's phone at 10:11 p.m. Based on the surveillance and phone evidence, Pierson concluded that after defendant went to the gas station, he received a call from Vaughn's phone. Pierson also concluded that defendant left the apartment complex at 10:19 p.m. The 911 call was made at 10:28 p.m. The Impala was back at White's place of employment, where it had been earlier that afternoon, by 10:36 p.m.

¶ 19    Beverly White testified that she was in a relationship with defendant. On the date of the shooting, defendant, wearing the plaid shirt, picked her up from work in her Chevy Impala. Defendant was known by the nickname "Booday." She further testified that she had known him for five years and did not know him to socialize with anyone involved in the incident.

5

¶ 20    Police learned that defendant was on parole at the time of the murders and was required to wear an ankle monitor. When arrested, defendant was hiding in the closet of an apartment adjacent to his own. He had cut off his ankle monitor and discarded it in the apartment. Alton police detective Jim Siatos interviewed defendant twice. At the first interview, on May 23, 2018, defendant denied involvement in the shooting but admitted to cutting off his ankle monitor when officers were trying to locate him. He claimed that he was home on the night of the incident and denied driving White's Impala that night.

¶ 21    The State introduced a video recording of Siatos's second interview with defendant, which took place later the same date. On the recording, defendant initially claimed that White drove her Impala to work on the day of the murders, and that he drove his Camaro to a fish fry in Madison at 5 p.m. before going straight home at 8:30 p.m. Later, he said that he did not get home until about 10:15 p.m. He later admitted that he had dropped off and picked up White in her Impala and not his Camaro. After police showed him photos of him in the Impala at River's Edge station at 9 p.m., he said he did not remember going there.

¶ 22    The police then told him about the GPS tracker on the Impala, and that they knew he had been at the apartment complex where the shooting occurred. Defendant continued to deny any involvement. He did state that he went to the area because someone flagged him down, and he saw three men go into an apartment. He denied going inside with them, but said he spoke to them at some point and could see them inside the apartment through a window. He said he was outside the apartment for around 10 minutes but continued to deny going inside.

¶ 23    Defendant told police that he heard gunshots but did not see anything. Later in the interview, he admitted that he "stepped in the house," where one of the men started arguing with him and another man. Defendant said that he left, while the other two men continued to argue. He

6

claimed that he heard gunshots as he was driving away. Throughout the interview, he insisted that he left before any shots were fired and that he did not kill anyone.

¶ 24    Defendant called Emaya Harris, who was present during the shootings. She said that the men at Terrea Gates's apartment had been there all day. Before the shooting, she did not hear any argument. Harris told police that one of the men stated that "he was really about that street shit" and would "shoot a mother fucker." Gates tried to get that man to leave the house. Harris had never seen defendant before. However, she did not really look at the men at Gates's apartment and "just glanced" at them. She said that there were four men in the house and that they had been there since 4 p.m., when she arrived at Gates's apartment.

¶ 25    Outside the presence of the jury, defendant informed the trial court that he wanted to further examine Scott Rochowicz and Marc Pomerance, the two forensic scientist witnesses who had already testified for the State. The court noted that those witnesses had already returned to Chicago. Defendant also wanted to question fingerprint examiner Thomas Gamboe, but the State had never subpoenaed him. Defendant admitted that it was his fault for not making sure he had been subpoenaed. On the following morning of trial, defendant again complained that he wanted to question the State's forensic experts in his case. The court stated that defendant should have questioned the experts when they testified for the State.

¶ 26    Questioning of the defense's witnesses continued. Alexis Purifoy and Elesia McClain were also present in the Gates residence on the night of the shooting, arriving at around 7 or 8 p.m. Purifoy testified that she had only been there a few minutes when the shots were fired. She recalled four or five men were in the kitchen playing cards when she arrived. Neither Purifoy nor Elesia recalled hearing any arguing in the kitchen. Both testified that they had never seen defendant before, but both also stated that they did not get a good look at any of the men playing cards.

7

Precious Steward testified that she was Gates's friend and White's daughter. She had known defendant for about seven years, and he was "[b]asically a step-dad" to her. She had never seen him at the Gates residence and had never seen him with a weapon. Defendant also called police sergeant Marcos Pulido, who testified that the video surveillance recordings showed that five flashes of light were seen at approximately 10:06 p.m. on one of the cameras. An ISP lab report introduced by defendant indicated that no fingerprints or DNA found on the cognac bottles linked defendant to the crime.

¶ 27    The trial court admonished defendant regarding his right to testify, and he declined to do so. Defendant recalled detective Siatos. In Siatos's interview with Gates, she told him that Vaughn, Ingram, and Williams arrived at her home at 9:50 p.m. Gates claimed that the shooter arrived shortly afterwards. Defendant had Siatos repeat numerous other parts of Gates's account from the interview, but he failed to elicit any testimony that contradicted or impeached Gates's testimony. After defendant had been questioning Siatos for a considerable time, the court advised him that it would limit him to 10 more minutes of examination once the trial resumed after lunch recess.

¶ 28    After that examination concluded, the trial court declared that the defense rested. Defendant indicated that he had a question, and the court stated that it would address defendant's question outside the presence of the jury. Outside the presence of the jury, defendant expressed a desire to play some of the recorded police interviews of Williams and Gates. The State responded that it spent considerable time preparing the DVDs of those interviews per his request and had tendered them to defendant, with the State's agreement that he could play them when Officer Reed testified. Because defendant did not elect to use the DVDs when Reed testified, the State objected to him being permitted to play the DVDs. The court sustained the objection, and the parties proceeded to closing statements. The jury subsequently found defendant guilty on all counts.

¶ 29    On October 30, 2018, defendant filed a letter with the trial court requesting counsel for what he described as "post-conviction proceedings." The court appointed an attorney to represent him. On September 25, 2019, appointed counsel filed a posttrial motion and motion for a new trial that included claims about subpoenaed defense witnesses not appearing, and the court's refusal to allow defendant to impeach Gates and Williams with their statements from the police interview DVDs. A supplemental motion was added on September 26, 2019, alleging that defendant was denied the right to counsel or stand-by counsel, and was not capable of waiving his right to counsel.

¶ 30    The trial court addressed the motions at a sentencing hearing held on September 27, 2019. In arguing the motions, the defense focused on the court's admission of unfairly prejudicial autopsy photos, the failure to recall the forensic experts from Chicago, the failure of four defense witnesses to appear at trial, the failure to admit the DVD evidence for impeachment purposes, and the denial of the right to counsel.

¶ 31    The defense argued that three of the four witnesses who failed to appear would have "testified that they were outside of their residence, which was next door to Terrea Gates's residence, and did not see the defendant go in and/or out of the house." Another witness would have refuted Williams's testimony that he did not know defendant. Counsel argued that the DVD interviews would have refuted Gates's testimony that defendant was wearing a red shirt and hat, and Williams's testimony that he did not know defendant. In its response, the State noted that defendant never requested a warrant for the witnesses who failed to appear. After considering the parties' arguments, the trial court denied the defense's motions.

¶ 32    During the sentencing hearing, the State noted that section 5-8-1(a)(1)(c)(ii) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2018)) required the imposition of a natural life sentence for the two murders. The trial court sentenced defendant to natural life in

prison for the two murders, seven years for unlawful possession of a weapon by a felon, and five years for escape, all to be served consecutively. The final judgment was entered on October 1, 2019. The court summarily denied the defense's motion to reconsider sentence on October 10, 2019.

¶ 33 On September 8, 2020, defendant filed a *pro se* motion for leave to file a successive postconviction petition, seeking to begin the postconviction process and restore his right to a direct appeal. The trial court construed the motion as an initial postconviction petition and later appointed new counsel to represent defendant.

¶ 34 On April 10, 2024, newly appointed counsel filed a certificate pursuant to Illinois Supreme Court Rule 651(c) (eff. July 1, 2017). She filed an amended verified petition for postconviction relief, requesting an order allowing defendant leave to file a late notice of appeal due to ineffective assistance of counsel. The State indicated that it had no objection. On May 1, 2024, the trial court granted the petition and directed the clerk of the court to file a notice of appeal for defendant.

¶ 35 On May 2, 2024, the clerk of the court filed a notice of appeal on defendant's behalf, but the notice mistakenly stated that the order appealed from was the trial court's order of May 1, 2024, which granted defendant's request for direct appeal. OSAD, as defendant's appointed counsel on appeal, filed a motion for a supervisory order with the Illinois Supreme Court, asking it to direct this court to treat the notice of appeal as a properly perfected appeal from the October 1, 2019, final judgment and the October 10, 2019, order denying the motion to reconsider sentence. The supreme court granted the request. OSAD now moves to withdraw as counsel.

¶ 36                                         ANALYSIS

¶ 37 OSAD argues that there are no meritorious arguments where the trial court properly entered judgment against defendant and correctly denied his motion to reconsider sentence. In the

memorandum supporting its *Anders* motion to withdraw as counsel, OSAD states that it considered raising five potential issues on appeal: (1) whether the trial court erred in granting defendant's request to represent himself; (2) whether the evidence against defendant was sufficient to prove his guilt beyond a reasonable doubt; (3) whether the court erred when it imposed a time limit on defendant's examination of witness Jim Siatos; (4) whether the court denied defendant due process and a fair trial when it declared that the defense had rested, despite the fact that he still wished to present additional evidence;[1] and (5) whether the court erred in admitting the certain State exhibits. We address these potential issues in turn.

¶ 38                    A. Defendant's Request to Represent Himself

¶ 39    The United States and Illinois Constitutions guarantee criminal defendants the right to counsel at all critical stages of the proceedings against them. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. The right to counsel may be waived; to proceed *pro se*, "a defendant must knowingly and intelligently relinquish his right to counsel." *People v. Baez*, 241 Ill. 2d 44, 115-16 (2011); *People v. Seal*, 2015 IL App (4th) 130775, ¶ 27 ("A defendant may *** proceed without counsel only if he voluntarily and intelligently elects to do so.").

¶ 40    Illinois Supreme Court Rule 401(a) governs the trial court's acceptance of a defendant's waiver of counsel, and states as follows:

> "Any waiver of counsel shall be in open court. The court shall not permit a waiver of counsel by a person accused of an offense punishable by imprisonment without first, by addressing the defendant personally in open court, informing him of and determining that he understands the following:
>
>          (1) the nature of the charge;

---

[1]OSAD notes that this includes defendant's posttrial claims that he wanted to present additional witness testimony and DVD evidence but had been barred from presenting it or had been unable to present it at trial.

11

(2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; and

(3) that he has a right to counsel and, if he is indigent, to have counsel appointed for him by the court." Ill. S. Ct. R. 401(a) (eff. July 1, 1984).

¶ 41    Compliance with Rule 401(a) is a prerequisite for an effective waiver of counsel. *People v. Marcum*, 2024 IL 128687, ¶ 46; *People v. Wright*, 2017 IL 119561, ¶ 41. However, " '[s]trict technical' " compliance with the rule is not always required; substantial compliance will suffice to effectuate a valid waiver " 'if the record indicates that the waiver was made knowingly and voluntarily, and the admonishment the defendant received did not prejudice his rights.' " *Wright*, 2017 IL 119561, ¶ 41 (quoting *People v. Haynes*, 174 Ill. 2d 204, 236 (1996)).

¶ 42    Our courts recognize two categories of substantial compliance with Rule 401:

"Substantial compliance occurs when any failure to fully provide admonishments does not prejudice defendant because either: (1) the absence of a detail from the admonishments did not impede defendant from giving a knowing and intelligent waiver or (2) defendant possessed a degree of knowledge or sophistication that excused the lack of admonition." *People v. Pike*, 2016 IL App (1st) 122626, ¶ 112.

In determining whether the defendant's waiver of counsel was valid, we consider the entirety of the record. *Id.* ¶ 113.

¶ 43    While the trial court's finding of whether a defendant's waiver of counsel was knowing and voluntary is reviewed for abuse of discretion, we review the legal question of whether the court substantially complied with the Rule 401(a) admonishments *de novo*. *Id.* ¶ 114.

¶ 44    In the present matter, the trial court failed to ask defendant if he understood the charges against him before granting his request to represent himself, as required by Rule 401(a). However, a review of the entire record shows that defendant understood the charges against him. The court reviewed the charges against defendant at the start of the hearing at which he made his waiver, and explained how each count stemmed from the incident in which defendant allegedly shot Vaughn

12

and Ingram, as well as removed his electronic monitor in violation of the terms of his conditional release in a separate case.

¶ 45    When defendant requested to represent himself, the trial court detailed his prior criminal history, including pleading guilty to felon possession of a firearm in 2017. He had represented himself in that case and therefore had some prior experience with waiving his right to counsel in a criminal matter. Additionally, his lengthy criminal history indicates a degree of familiarity with the criminal justice system. See *People v. Johnson*, 119 Ill. 2d 119, 133 (1987) (finding substantial compliance in part because defendant was "no stranger to criminal proceedings"); *People v. Jackson*, 59 Ill. App. 3d 1004, 1008-09 (1978) ("defendant's lengthy record and his familiarity with criminal law and procedure" showed he was not prejudiced by court's failure to specifically advise him on the minimum and maximum sentence). He also affirmatively expressed that he was not "guilty of these charges," suggesting that he understood what the charges against him were.

¶ 46    Later in the proceedings, defendant made several statements further indicating that he understood the nature of the charges against him, as he was aware of the facts that he needed to negate. At a hearing on one of his pretrial motions for dismissal of charges, defendant asserted that he had never owned a gun, that there was no murder weapon linked to him, that neither his DNA nor fingerprints were found at the crime scene, that his car was never seen on Lawn Street, and that there were several inconsistencies in the witness statements against him. In his opening statement at trial, defendant made several assertions relating to the nature of the charges, including, *inter alia*, that he had never been seen on Lawn Street, that he "didn't kill these people," that witnesses could not describe what he was wearing on the night of the murder, that he had never owned a firearm, and that he was not in the residence where the murder took place. The trial transcript shows that defendant challenged the State's evidence meant to show his presence at the

13

murder scene and questioned both his own and the State's witnesses to elicit testimony that he was not at the murder scene at the time of the shooting and that there was no physical evidence against him.

¶ 47    Thus, the record shows that the trial court's omission did not render its ruling reversible error. On the contrary, the court substantially complied with Rule 401 where the record demonstrates that defendant understood the nature of the charges against him, and the court provided all remaining Rule 401 admonitions. See *People v. Phillips*, 392 Ill. App. 3d 243, 262-64 (2009) (finding that court substantially complied with Rule 401(a) despite failing to admonish defendant on the nature of the charge, where the court stated the charges against him nine months prior to defendant's waiver, the "charges were fairly simple" and nothing in the record indicated that he lacked understanding, and defendant "had extensive experience with the court system"). We further find that any argument that defendant did not give a knowing and intelligent waiver would lack merit.

¶ 48                              B. Proof of Guilt Beyond a Reasonable Doubt

¶ 49    When considering the sufficiency of the evidence, "we determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the required elements of the crime beyond a reasonable doubt." *People v. Galarza*, 2023 IL 127678, ¶ 25. The trier of fact is responsible for weighing the evidence, resolving conflicts in the testimony, and drawing reasonable inferences from the facts, and we will not substitute its judgment with our own on questions involving the weight of the evidence or credibility of witnesses. *Id.* ¶¶ 25-26; *People v. Bradford*, 2016 IL 118674, ¶ 12. A conviction will only be reversed if " 'the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the

14

defendant's guilt.' " *Galarza*, 2023 IL 127678, ¶ 26 (quoting *People v. Belknap*, 2014 IL 117094, ¶ 67).

¶ 50    Here, OSAD admits that there were certain weaknesses in the State's evidence at trial, specifically noting that witness Terrea Gates testified that the shooter had worn a red shirt, while video and other evidence showed that defendant was not wearing a red shirt that evening. However, other evidence supported a finding that defendant was the shooter. Witness Terrion Williams described the shooter as wearing plaid, which matched defendant's outfit on that date. Both Gates and Williams identified defendant as the shooter in a photo array and again in court. Both witnesses described the shooter as having a scar over his right eye, which matched defendant's appearance.

¶ 51    Video and GPS evidence put defendant near the crime scene at the time of the shooting. During defendant's recorded police interrogation, he admitted that he was inside the apartment just before the time of the shooting, although he denied being the shooter. The account he gave to the police changed substantially over the course of the interrogation, which the jury was able to consider in assessing his credibility.

¶ 52    Defendant also presented witnesses who testified that they did not recall seeing him at the crime scene, but, as OSAD notes, there were inconsistencies in their testimonies. Additionally, some of these witnesses were in a different part of the apartment at the time and therefore had limited opportunity to observe defendant at the scene. Lastly, as to the charge of escape, defendant admitted to removing his electronic ankle monitor.

¶ 53    After reviewing the trial record, we conclude that the totality of the evidence, viewed in a light most favorable to the State, was sufficient to support a rational fact finder's finding of guilt on all counts beyond a reasonable doubt. We further determine that any argument to the contrary would lack merit.

15

¶ 54                C. Time Limit on Witness Examination

¶ 55    After defendant's lengthy examination of witness Jim Siatos approximately one week into

the trial, the trial court announced that upon everyone's return from lunch recess, defendant would

only have 10 minutes to finish his questioning of Siatos. In discussing this with defendant and

counsel for the State, the court explained that defendant was consistently failing to follow the rules,

resulting in numerous objections. He also frequently repeated questions that he had already asked,

eliciting no new relevant information.

¶ 56    While there is no rule speaking to the trial court's authority to limit direct examination, "it

is well established that while a trial court may not deprive a defendant of the right to question

witnesses, it may limit the scope of cross-examination under its discretionary powers." *People v.*

*Wilson*, 2012 IL App (1st) 092910, ¶ 24. Additionally, our supreme court has held that "trial courts

possess discretion in determining the admissibility of evidence, and a reviewing court may

overturn a trial court's decision only when the record clearly demonstrates the court abused its

discretion." *People v. Harris*, 231 Ill. 2d 582, 588 (2008). It is also well established that the court

has the inherent authority to control its own docket to prevent delays and to ensure compliance

with court rules and orders. *Dolan v. O'Callaghan*, 2012 IL App (1st) 111505, ¶ 65.

¶ 57    Applying the above authority to the present matter, we conclude that the trial court had

discretion to impose a time limit on the remainder of defendant's direct examination of Siatos,

where he questioned him at length and was repeating questions rather than eliciting new, relevant

information. Furthermore, even if defendant could argue that the court abused its discretion in

limiting his remaining time for questioning, we find that it would, at most, amount to a harmless

evidentiary error. Evidentiary error "becomes harmless where no reasonable probability exists that

the trial court would have acquitted the defendant absent the error." *People v. Sheppard*, 2021 IL App (1st) 181613, ¶ 23.

¶ 58 As previously stated, defendant was allowed to question Siatos for a considerable amount of time before the court decided to limit him to 10 more minutes. It is also clear from the record that further questioning would not have resulted in additional evidence for the defense. By allowing the final 10 minutes to take place after recess, the court gave defendant time to prepare his remaining questions to best utilize that time. There was copious other testimony, including from defendant's other witnesses, for the jury to consider in this case. In conclusion, nothing in the record suggests that there is any reasonable probability that defendant would have been acquitted if he had been able to continue questioning Siatos past the court-imposed limit. There is no possible good-faith argument that could be brought in support of this issue.

¶ 59 D. Court's Declaration That the Defense Rests

¶ 60 On the seventh day of trial, after the trial court informed defendant that his time for questioning Siatos had ended and the State declined cross-examination, the court asked defendant whether the defense rested, or if he had any additional witnesses. The court also reminded him that he had said before the lunch break that he did not have any more witnesses. Defendant responded that he had other witnesses but did not know whether they had come to court. After the court confirmed that there were no witnesses waiting outside the courtroom, the following exchange occurred:

"THE COURT: All right. Defense rests then? No other witnesses?
THE DEFENDANT: I had a question.
THE COURT: We will take the question outside the presence of the jury. Defense rests. Any rebuttal evidence on behalf of the State?
MS. HEISCHMIDT: No, Your Honor."

17

The court then excused the jury and allowed defendant to ask his question. Defendant asked the court when he would be allowed to play DVDs containing clips from the recorded police interviews of Terrea Gates and Terrion Williams for the jury. The court advised that he had never asked to play them during trial.

¶ 61　　The State objected to defendant's request to play the DVDs, explaining that defendant had indicated to the State that he wished to play certain clips from the interviews in the further questioning of Officer Reed. Despite its position that there was no foundation for allowing the clips to be played, the State had agreed to his request and tendered DVDs with the video clips to defendant, stating that it would not object to his use of the exhibits for additional questioning of Reed. Reed took the stand, and defendant questioned him on direct examination and redirect. At no point did defendant ask the court to play the DVD exhibits, nor did he bring up the video clips in any way. The State further explained that defendant instead presented certain police reports to Reed, and essentially had him read his report into the record. The State contended that the report was based on the contents of the video, and thus calling him back for the requested purpose would only serve to cause delay.

¶ 62　　Defendant expressed confusion as to why he had not been able to play the videos at trial, and the court explained that he had been given the opportunity to question the police witnesses, and to recall certain witnesses with whom he had wanted to use the video clips. However, he never made the request to play the DVDs. The court further reminded him that, in choosing to proceed *pro se*, he had been warned of the consequences of representing himself and had been told that he could have an attorney appointed to him if he so wished.

¶ 63　　The trial court also told him that he could still address any inconsistencies in the officers' testimony in his closing statement. Defendant stated that he was not prepared to deliver his closing

18

statement, to which the court responded that it had told him the previous Friday that the trial would conclude on Monday, and he should use the weekend to prepare his closing statement. Nevertheless, the court allowed him an additional 10 minutes to prepare. Following a short recess, both sides gave their closing statements, and the jury began its deliberation.

¶ 64    As we stated above, the trial court has discretion over the admissibility of evidence, and we will not overturn its decision absent an abuse of that discretion. *Harris*, 231 Ill. 2d at 588. Furthermore, as the court explained to defendant both when he waived counsel and when the court denied his request to play his DVD exhibits, the court could not offer him any assistance in his efforts to represent himself. A *pro se* defendant is not entitled to more lenient treatment, and he is still expected to have knowledge of and comply with all court rules and procedures. *People v. Arriaga*, 2023 IL App (5th) 220076, ¶ 22.

¶ 65    Here, while OSAD admits that it was unusual for the trial court—rather than the defense itself—to declare that the defense rested, the record clearly shows that defendant was in no way deprived of any opportunity to show all his exhibits and use them in questioning witnesses. The State did not object to his use of the video clips at trial—despite its position that he had not laid a proper foundation for this evidence—and in fact prepared and tendered the DVDs to him. He questioned the police witnesses and could have asked to have the clips played for them at any time. Regarding his specific intent to show them to Officer Reed, he instead questioned him about his police report, covering the same information as the videos. Therefore, even if the court had erred in not allowing him to present the videos after he had failed to make use of all prior opportunities to do so, it would certainly be harmless error. See *Sheppard*, 2021 IL App (1st) 181613, ¶ 23.

¶ 66    We also note that the trial court did not decide for defendant that the defense had rested—it asked him whether this was the case, and he confirmed that he had no further witnesses to

19

question because, according to him, any other witnesses he intended to call did not appear. Therefore, the appropriate issue for review is not whether the court erred in deciding that the defense had rested, but rather, whether it abused its discretion by denying his request to present additional evidence.

¶ 67     While the discussion before the trial court concerned only the DVD exhibits, defendant asserted in his posttrial motion that there were three categories of evidence that he wanted to present to the jury but was allegedly prevented from presenting: (1) additional testimony from State forensic witness Marc Pomerance, (2) testimony from the four witnesses who he had subpoenaed but who did not appear, and (3) the aforementioned DVDs of the recorded police interviews of Terrea Gates and Terrion Williams. For the reasons previously discussed and additionally explained below, we determine that none of these raise a potentially meritorious claim.

¶ 68                              i. *Forensic Witness Testimony*

¶ 69     The record shows that defendant did cross-examine Pomerance, and limited his questioning to the scope of direct examination. Defendant expressed confusion over the relevant procedures when he told the court that he believed that he could recall a State witness and present his own evidence after the State had finished with this witness. The court explained to him that he did not get to recall the witness and should have asked him his questions while the witness was present.

¶ 70     Defendant appears to have been unaware of the principle that, while cross-examination is generally limited to the scope of direct examination, "this rule has been modified to the extent that it is proper on cross-examination to develop all circumstances within the knowledge of the witness that explain, qualify, discredit or destroy his direct testimony, even if such examination constitutes new matter that aids the cross-examiner's case." *People v. Stevens*, 2014 IL 116300, ¶ 16. Again,

20

his choice to proceed *pro se* does not excuse defendant's lack of knowledge in this area, nor does it entitle him to greater lenience. *Arriaga*, 2023 IL App (5th) 220076, ¶ 22.

¶ 71　Additionally, defendant never explained what additional evidence he expected to elicit from further questioning of Pomerance, or how that could affect the outcome of the trial. Therefore, as with the aforementioned video evidence, the court's decision would, at most, amount to harmless error.

¶ 72　　　　　　　　　　　　ii. *Witnesses Who Did Not Appear*

¶ 73　Regarding the four witnesses who defendant subpoenaed but who did not appear, defendant alleged that three of them would have testified that "they were outside of their residence, which was next door to Terrea Gates's residence, and did not see the defendant go in and/or out of the house." The fourth, Lakesha Robertson, would allegedly contradict Terrion Williams's testimony by stating "that she knew that Mr. Williams knew Defendant and had seen them together before."

¶ 74　While OSAD admits that this evidence could have strengthened the defense's case, it argues that defendant never asked the trial court to issue a warrant or otherwise enforce the subpoenas to secure the appearance of the witnesses. Nor could he argue that the court was required to enforce the subpoenas *sua sponte*. Furthermore, as he never requested to enforce the subpoenas, there is no court ruling for us to review on this issue. See *People v. Barnes*, 130 Ill. App. 3d 1026, 1030 (1985) (where the defendant did not renew his motion to compel the appearance of a witness or seek a continuance to prepare the foundation for the anticipated testimony, the court did not abuse its discretion in declining to declare continuance *sua sponte* to enforce subpoena).

¶ 75　Lastly, we note that defendant's motion for a new trial based on factual allegations outside the record was not supported by any sworn affidavits supporting these allegations. See *People v. Follins*, 196 Ill. App. 3d 680, 690-91 (1990); *People v. Miles*, 176 Ill. App. 3d 758, 773 (1988).

21

¶ 76                    iii. *Gates and Williams Police Interview Videos*

¶ 77    As we previously explained, defendant was not prevented from presenting recordings of Gates's and Williams's interviews at trial. However, we also add that he failed to act on any opportunity to have a witness authenticate the recordings so that they could be properly admitted into evidence. He instead sought to have the videos admitted without proper authentication or foundation. Despite the State's position that it was prepared to excuse this failure if defendant had brought up the videos at trial, it would not have been an abuse of the trial court's discretion to deny his request to play them without laying a proper foundation.

¶ 78    Fundamental rules of evidence require that a party must lay the proper foundation for the introduction of a piece of evidence. *Piser v. State Farm Mutual Automobile Insurance Co.*, 405 Ill. App. 3d 341, 348 (2010). There are two ways to provide the foundation for a video recording: (1) through a witness who can authenticate the content of the recording by testifying that it accurately represents what he or she personally saw or heard or (2) through sufficient proof of the reliability of the process that produced the recording, including establishing the preservation of a chain of custody and there were no changes, additions, or deletions to the recording. *People v. Dennis*, 2011 IL App (5th) 090346, ¶ 23.

¶ 79    Here, defendant failed to lay a proper foundation for the police interview videos, despite being given every opportunity to do so. We reiterate that he was expected to know and follow evidentiary rules just as if he had been represented by counsel. We therefore conclude that no good-faith claim could be brought on the basis that the trial court unfairly prohibited him from presenting any additional evidence.

¶ 80                                    E. Admission of State Exhibits

¶ 81    In addition to the above, defendant also claimed in his posttrial motion that the trial court

erred in admitting several State exhibits. At trial, he failed to raise any valid objection to any of

the exhibits.

¶ 82    He objected to the crime scene photos because he "really [didn't] feel the need to show the

pictures." He objected to the projectiles and bullet casings on the basis that it was unnecessary to

admit them, as photos of these objects had already been admitted. He objected to the introduction

of his prior conviction for unlawful possession of weapons by a felon on the ground that he was

not in court because of anything in his background. The State correctly responded that the prior

conviction was an element of one of the offenses charged—the fifth count alleged that he

knowingly possessed a firearm after a prior conviction for unlawful possession of a firearm by a

felon, and the prior conviction was necessary to prove a Class 2 felony. Lastly, he objected to the

autopsy photos because "[n]o one deserves to be seen like that."

¶ 83    None of these are valid objections. Regardless, OSAD considered whether defendant

would have had a meritorious claim if the objection to the autopsy photos could be construed as

objecting on the ground that the photos were unfairly prejudicial.

¶ 84    Our supreme court has held that photos of a victim, while gruesome, are nevertheless

admissible if they are relevant, "unless the prejudicial nature of the photographs outweighs their

probative value." *People v. Chapman*, 194 Ill. 2d 186, 219 (2000); see also *People v. Carr-

McKnight*, 2020 IL App (1st) 163245, ¶ 97. Examples of valid reasons to admit victim photographs

include "to prove the nature and extent of the injuries, the position, condition, and location of the

body, and the manner and cause of death; to corroborate a defendant's confession; and to aid in

understanding the testimony of a pathologist or other witness." *Chapman*, 194 Ill. 2d at 220.

Furthermore, if the photos could aid the jury un understanding testimony, "they may be admitted even if cumulative of that testimony." *Id.* The decision of whether to show these photos to the jury rests within the sound discretion of the trial court. *Id.* at 219.

¶ 85    In the present matter, the record is clear that the State used the autopsy photos to provide evidence of the victims' injuries and of the manner and cause of their deaths. The record further shows that defendant did not present any reason why the photos would be unfairly prejudicial to him. Therefore, we conclude that any argument that the court abused its discretion by admitting any of the exhibits mentioned in defendant's posttrial motion would lack merit.

¶ 86                                                CONCLUSION

¶ 87    As this appeal presents no issue of arguable merit, we grant OSAD leave to withdraw and affirm the trial court's judgment.


¶ 88    Motion granted; judgment affirmed.

24